364 F.2d 709
 FEDERAL MARITIME COMMISSION, Petitioner-Appellant and Cross-Appellee,
v.
E. G. CARAGHER, Vice President, Norton Lilly & Co., Inc., et
al., Respondents-Appellees and Cross-Appellants, and
Mordecai Chovers, Vice President, American-Israeli Shipping
Co., Inc., General Agent for Zim Israel Navigation Co.,
Ltd., Respondent-Appellee.
 No. 224, Docket 30041.
 United States Court of Appeals Second Circuit.
 Argued Feb. 21, 1966.
Decided Aug. 3, 1966.
 
 David L. Rose, Atty., Dept. of Justice; J. William Doolittle, Acting Asst. Atty. Gen., Robert M. Morgenthau, U.S. Atty., S.D. New York; Jack H. Weiner, Atty., Dept. of Justice; H. B. Mutter, Acting Sol., Federal Maritime Commission, for petitioner-appellant and cross-appellee.
 Thomas K. Roche, Haight, Gardner, Poor & K. Roche, Haight, Gardner, liam F. Faison, New York City, for respondents-appellees and cross-appellants.
 David I. Gilchrist, Hill, Betts, Yamaoka, Freehill & Longcope, Edwin Longcope, New York City, for respondent-appellee.
 Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 This action was commenced in the United States District Court for the Southern District of New York by the Federal Maritime Commission (hereafter the Commission) to enforce subpoenas duces tecum issued to the Respondents-Appellees and Cross-Appellants (hereafter Respondents) pursuant to Section 27 of the Shipping Act of 1916.[1] Each of the respondents is either the principal officer or custodian of records for each of the respondent common carrier steamship lines, which in turn are all members of the New York Freight Bureau (Hong Kong) engaged in the transportation of commodities by water between Hong Kong and the Atlantic and Gulf ports of the United States.[2]
 
 I.
 
 2
 The subpoenas duces tecum were issued in connection with an 'Investigation of Rates in the Hong Kong-United States Atlantic and Gulf Trade,' begun by the Commission on December 10, 1962, pursuant to Section 22 of the Shipping Act of 1916,[3] after Sabre Line had filed an informal protest against the present level of rates charged by the New York Freight Bureau (Hong Kong). The original purpose of the investigation was to determine whether any rate in this trade[4] was 'so unreasonably low as to be detrimental to the commerce of the United States' and thus should be disapproved by the Commission pursuant to Section 18(b)(5) of the Shipping Act of 1916.[5] Thereafter, at the instance of one of the respondents, the Isbrandtsen Steamship Company Division of American Export Lines, the investigation was expanded by a Commission order dated June 20, 1963, so as also to determine 'whether any of the respondents are, or have been, engaging in practices which may be in violation of Sections 14, 16, or 17 of the Shipping Act of 1916,[6] or which may result in the charging of lower rates than the rates on file with the Commission, in violation of Section 18(b)(3) of the Act.'[7]
 
 
 3
 The scope of the investigation having been finally defined, Hearing Counsel,[8] on September 3, 1963, pursuant to authority purportedly granted the Commission by Section 27 of the Shipping Act of 1916,[9] filed an application to serve upon each respondent a subpoena duces tecum calling for the production of: '(1) All inbound rated manifests for cargo transported from Hong Kong to the Atlantic or Gulf coasts from January 1, 1962 to the present; (2) All inbound rated manifests in possession of the addressees at the time of the hearing for cargo loaded in Hong Kong but which vessels have not yet arrived at Atlantic or Gulf ports; (3) All stevedoring and terminal services contracts which contained rates and conditions for handling cargo moving from Hong Kong to New York City, New York, during the year 1962; (4) All invoices evidencing billing for stevedoring and terminal services in connection with handling cargo moving from Hong Kong to New York City, New York, during the year 1962; and (5) All cancelled checks or receipts for payment for stevedoring and terminal services in connection with handling cargo moving from Hong Kong to New York City, New York, during the year 1962.'[10]
 
 
 4
 A hearing in furtherance of the underlying investigation was held on April 21, 1964. Some of the named respondents produced all the documents mentioned in the subpoenas or availed themselves of an alternate procedure suggested by the Hearing Counsel and agreed to permit inspection of the documents by employees of the Commission at a time and place mutually agreeable to Hearing Counsel and to them. Respondent Mordecai Chovers, representative of Zim Israel Navigation Co., Ltd., produced the documents referred to in times (1) and (2) of the subpoena but refused to produce the documents referred to in items (3), (4), and (5). The respondents-appellees and cross-appellants in this case refused to produce any of the documents to which the subpoenas referred. On June 2, 1964 the Hearing Examiner referred the refusals to the Commission for action. The hearing was concluded on July 2, 1964 without definite action having been taken on the refusals.[11] Thereafter, briefs were filed by all the parties in connection with the underlying investigation and the matter was submitted to the Hearing Examiner for decision on February 5, 1965. No decision has yet been handed down by the Hearing Examiner who is awaiting the outcome of the present enforcement proceedings.[12]
 
 
 5
 On May 19, 1965, almost one year after the investigation was concluded and more than three months after the matter was submitted to the Hearing Examiner for decision, the Commission, pursuant to Section 29 of the Shipping Act of 1916,[13] applied to the court below for an order to show cause why respondents should not be compelled to comply fully with the subpoenas issued by the Examiner. Respondents opposed enforcement on the following three grounds: the requested documents were not relevant; the hearing had already been concluded and the record closed; Section 27's grant of subpoena power to the Commission expressly provided that the power could only be used 'for the purpose of investigating alleged violations' of the Act and thus was inapplicable to a Section 18(b)(5) rate investigation proceeding because that Section did not in terms provide for investigations of 'violations' but merely stated the Commission had the power to disapprove rates 'which after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States.' The district court directed compliance with items (1) and (2) of the subpoenas on the ground the documents requested (cargo manifests) appeared relevant to the investigation of possible violations of Sections 14, 16, 17 and 18(b)(3).[14] It sustained respondents' view of the limits of the Commission's subpoena power and denied enforcement as to items (3), (4), and (5), holding that the documents requested (stevedoring records) were relevant only to the Section 18(b)(5) claim that the rates charged by the New York Freight Bureau (Hong King) were unreasonably low, and that the Commission lacked the power to issue subpoenas in Section 18(b)(5) investigations. Federal Maritime Commission v. Caragher, 243 F.Supp. 136 (SDNY1965).
 
 
 6
 The Commission has appealed from the district court's order denying enforcement of the subpoenas duces tecum as to items (3), (4), and (5). All respondents other than Mordecai Chovers appeal the grant of enforcement as to items (1) and (2). We affirm the district court as to items (1) and (2) and reverse it as to items (3), (4), and (5). We remand with directions to enforce the subpoenas in their entirety.
 
 II.
 
 7
 Our decision that the Commission has the power to subpoena in a Section 18(b) (5) investigation requires a preliminary review of the manner in which the Shipping Act of 1916 attempted to regulate common carriers by water in foreign commerce, defined by the Act as transportation between the United States and foreign countries.[15] As originally enacted, the Act contained at least three distinct types of regulatory provisions. Some provisions, in terms, proscribed certain objectionable anticompetitive practices: for example, Section 14 forbade regulated carriers to employ deferred rebates, or 'fighting ships,' or to retaliate against shippers;[16] Section 16, in terms, prohibited rebates on established tariffs and outlawed undue preference or prejudice to any person, locality, or type of traffic.[17] A second group of provisions combatted anticompetitive practices indirectly by granting the Commission power to determine on a case-by-case basis in light of broad normative criteria whether certain practices should be disapproved: for example, Section 15 required anticompetitive agreements to be filed with the Commission and granted the Commission power to disapprove unfair or unjustly discriminatory agreements and those detrimental to United States commerce or contrary to the public interest.[18] See Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635, 639 (1965). Yet a third group of provisions in the 1916 Act granted the Commission power to investigate matters not subject to its regulatory jurisdiction, which investigations would not lead to adjudicative orders but would result in reports to Congress or to the President for such action as might be deemed advisable. Shipping Act of 1916 12, 46 U.S.C. 811 (investigations as to costs of domestic and foreign merchant vessels);[19] 26, 46 U.S.C. 825 (investigations as to acts of foreign governments).
 
 
 8
 In addition to the authority granted by the 1916 Act to the Commission to conduct the investigations provided for in Sections 12 and 26, the Commission is authorized under Section 22 also to investigate 'any violation' of the Act upon complaint or upon its own motion. Investigations such as the one at bar, which culminate in adjudicatory action by the Commission rather than in reports to Congress or the President are conducted under the authority granted by Section 22 to 'investigate any violation' of the Act.[20]
 
 
 9
 Section 27 of the 1916 Act gave the Commission power to issue subpoenas 'for the purpose of investigating alleged violations' of the Act. Respondents' contention, sustained below, is that the grant of this power in Section 27 only permits the Commission to issue subpoenas in Section 22 investigations commenced to determine whether there has been a violation of a provision like Section 14 that proscribes certain anticompetitive practices; and that this grant of subpoena power does not permit the Commission to issue subpoenas in Section 22 investigations commenced in furtherance of the Commission's responsibility under a provision like Section 15, or like Section 18(b)(5), that requires the Commission to decide in light of broad normative criteria whether certain practices should be disapproved. Respondents apparently argue that a practice that the Act does not, in terms, denominate unlawful but instead subjects to Commission scrutiny cannot be said to 'violate' the Act until the Commission has held a hearing and disapproved it. Respondents thus urge that we conclude that an investigation commenced in order to decide whether a certain practice should be disapproved is not an investigation 'for the purpose of investigation alleged violations' of the Act and that the subpoena power is therefore not available to the Commission in conducting such an investigation.
 
 
 10
 We reject respondents' contention as inconsistent with both the ostensible purpose of the regulatory pattern established by the Shipping Act of 1916 and the legislative history of Section 27.
 
 
 11
 First, it must be recognized that the adoption of respondents' contention would result in a regulatory statute that is unworkable in several significant respects. If a Commission investigation commenced in order to discharge its duty under provisions like Section 15 or Section 18(b)(5), which require it to decide in light of broad criteria whether certain practices should be disapproved, is not 'for the purpose of investigating alleged violations' of the Act within Section 27, it presumably is also not an investigation of 'any violation' of the Act and hence is not an investigation authorized by Section 22. The result would be a regulatory statute that, for example, expressly required the Commission to hold hearings and disapprove unfair or unjustly discriminatory agreements and those detrimental to United States commerce or contrary to the public interest[21] and yet anomalously failed to provide the Commission, charged with this statutory responsibility, with authority to compel the attendance of witnesses or production of documents at the hearings, or indeed with authority to conduct an investigation, on order to discharge this statutory responsibility. We would be reluctant to conclude that Congress intended such an unworkable and nonsensical result and we would so conclude only if this result could not be avoided by any fair interpretation of the 1916 Act. United States v. American Trucking Ass'n, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199 (1922). Not surprisingly, one readily perceives a sensible and workable interpretation of the Section's purpose in relation to the overall purposes of the 1916 Act. We hold that when Congress provided in Section 27 that the Commission might exercise the power of subpoena 'for the purpose of investigating alleged violations' of the Act it intended to authorize the Commission's use of the subpoena power in investigations of alleged violations, commenced pursuant to Section 22. The latter Section's authorization to investigate 'any violation' of the Act is, in turn, most sensibly interpreted as authorizing the Commission to investigate in order to determine both whether provisions that proscribe certain anticompetitive practices have been violated and whether certain practices, which the Commission has authority to disapprove, should be disapproved. If Section 22 were not interpreted to include investigations of both varieties, as we have noted, the Act would contain no authorization for investigations to enforce the second of its three distinct types of regulatory provisions.[22] From this interpretation of Section 22 and our conclusion that the phrase 'for the purpose of investigating alleged violations' in Section 27 refers to investigations under Section 22 of 'any violation' it follows that Section 27 not only authorizes the Commission to issue subpoenas in investigations commenced pursuant to those regulatory provisions of the Act that in terms proscribe anticompetitive practices but also in investigations commenced pursuant to those regulatory provisions that authorize the Commission to disapprove certain practices in light of broad normative criteria. To be sure, as we have pointed out, the Shipping Act of 1916 also authorized the Commission to investigate certain matters, like relative shipping costs here and abroad, and the acts of foreign governments, which matters are not subject to the Commission's regulatory jurisdiction. There are not investigations of 'any violation' of the Act within Section 22[23] and thus they are not investigations 'for the purpose of investigating alleged violations' within Section 27; so it follows that the Commission is not authorized to exercise itssubpoena power in connection with this type of investigation.
 
 
 12
 The legislative history of the Shipping Act of 1916 confirms our view that Congress authorized the use of the subpoena power in all investigations by the Commission pursuant to Section 22, whether the proceeding concerned a provision that in terms proscribed certain anticompetitive activity or was brought to determine whether certain activity should be disapproved. In general, the regulatory scheme established by the Act was patterned after that of the Interstate Commerce Act. Representative Alexander, the Act's sponsor, explained the meaning of Section 27 as follows:
 
 
 13
 The provision of Section 27 relating to the power of the board (now the Commission) to compel the attendance of witnesses and the production of documents and other evidence are also substantially similar to those of the interstate commerce act, except that the board may exercise such power only 'for the purpose of investigating alleged violations of the act' instead of 'for the purpose of this act' as in the interstate commerce act. Under this broad phrase in the latter act as construed by the Supreme Court (Harriman v. United States (Interstate Commerce Com.) 211 U.S. 407 (29 S.Ct. 115, 53 L.Ed. 253) (1908)), the power of the board is limited to investigation of violations. 53 Cong.Rec. 8081 (1916).
 
 
 14
 The House Report on the Alexander bill contains an almost identical explanation of Section 27. H.R.Rep. No. 659, 64th Cong., 1st Sess. 33 (1916). The Senate Report on the bill merely reproduced the House Committee comment. S.Rep. No. 689, 64th Cong., 1st Sess. 13 (1916). The much criticized decision in Harriman v. Interstate Commerce Com., 211 U.S. 407, 29 S.Ct. 115 (1908) is therefore important to an understanding of the Commission's Section 27 subpoena power.
 
 
 15
 In Harriman v. Interstate Commerce Com. Supra, the Court was faced with determining the scope of the Interstate Commerce Commission's authority to compel a witness to testify before it. The Interstate Commerce Act authorized the ICC, either upon complaint or upon its own motion, to insure compliance with the provisions of the Act, like those prohibiting discrimination and poolings of freights, and those requiring that charges be reasonable and that rates by published. Consolidations and mergers, as such, were not then within the regulatory jurisdiction of the ICC; however, the Act did authorize the ICC to conduct investigations into the operation of interstate commerce in order that it might recommend additional legislation to the Congress. Pursuant to this latter authority, the ICC in 1906 commenced an investigation of railroad mergers and consolidations and it subpoenaed the president and chief executive officer of the Union Pacific Railroad to testify. The ICC contended its power of subpoena 'for the purposes of this Act' empowered it to compel testimony in an investigation that was not brought to insure compliance with a rugulatory provision but instead to further the ICC's statutory duty to recommend legislation to the Congress. 211 U.S. at 419, 29 S.Ct. at 118 Justice Holmes, speaking for a majority of the Court, rejected the Commission's position, holding that '* * * the purposes of the act for which the Commission may exact evidence embrace only complaints for violation of the act, and investigations by the Commission upon matters that might have been made the object of the complaint.' Ibid.
 
 
 16
 Justice Holmes's reasoning in Harriman clarifies the Congressional attempts to explain Section 27 of the Shipping Act of 1916. Congress understood Harriman to have interpreted the provision of the Interstate Commerce Act that authorized the ICC to exercise subpoena power 'for the purposes of this act' so as to limit the ICC's subpoena power to 'investigations of violations' and to 'investigations upon matters that might have been made the object of complaint.' Congress simply codified the Harriman interpretation when it used the language 'for the purpose of investigating alleged violations,' rather than 'for the purposes of this act,' to define the Federal Maritime Commission's Section 27 subpoena power. In the absence of any shred of evidence to the contrary, there is every reason to adopt the eminently reasonable conclusion that in so condifying Harriman Congress intended to vest the power of subpoena in the Commission in all those cases in which Harriman indicated that that power was proper: that is in all cases where 'complaints for violation of the act' were filed by private parties, or where an investigation was conducted by the Commission 'upon matters that might have been made the object of complaint.' In other words, Congress intended to authorize the use of the subpoena power in all investigations pursuant to Section 22 whether commenced upon complaint or on the Commission's own motion; and from the 1916 Act's inception, as we have seen, this included on the one hand investigations to determine whether a provision that in terms proscribes certain anticompetitive practices has been violated and, on the other, investigations commenced to further the Commission's responsibility to decide in light of broad criteria whether certain practices should be disapproved.
 
 
 17
 Our interpretation of the grant of authority to the Commission under Section 27 to exercise the power of subpoena 'for the purpose of investigating alleged violations' of the Act renders nugatory respondents' contention that the Commission cannot exercise the subpoena power in a Section 18(b)(5) investigation because that Section does not provide, in terms, for investigations of 'violations' but merely states that the Commission has the power to disapprove rates 'which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States.' Section 18(b)(5) was a provision contained in the 1961 Amendments to the Shipping Act of 1916. It authorizes the Commission to disapprove rates that fail to satisfy the broad criteria set forth in that Section, and is typical of the second of the three distinct Shipping Act has contained since its inception. The legislative history of the types of regulatory provisions that the Section indicates that the drafters of the statute intended it to codify administrative interpretations of Section 15, which had held that unreasonably high or low rates were 'detrimental to the commerce of the United States in violation of Section 15 of the Act.' E.g., 107 Cong.Rec. 18248-49 (1961) (remarks of Senator Kefauver). Investigations brought to enforce this type of regulatory provision are brought pursuant to Section 22 of the Act; they quite clearly concern matters that might have been made the object of complaint. It follows that, unless there is strong countervailing evidence of a contrary intent, Congress intended that the Commission could exercise its Section 27 subpoena power in furtherance of such investigations.
 
 
 18
 Respondents point out, however, that during the course of Congressional deliberations on the 1961 amendments to the Shipping Act a specific provision making it 'unlawful' for a regulated carrier to reduce its rates unreasonably was considered and rejected and thereafter Section 18(b)(5) was enacted; they urge that this history proves that Congress in creating Section 18(b)(5) did not intend that it should be a provision that a regulated carrier could 'violate.' On the contrary, we believe Congress's choice to insure compliance with its normative command that rates be reasonable by means of the second rather than the first type of regulatory mechanism utilized in the Shipping Act[24] simplyreflects Congress's awareness that whether a certain rate is 'unreasonable' is often a close question and that consequently a regulated carrier should be liable for Section 18's stiff penalties[25] only if it continues to charge unreasonable rates after the Commission has determined they are unreasonable.[26] Respondents also note that in 1961 Congress refused the Commission's request that its subpoena powers be expanded and consider this occurrence germane to our present inquiry. Although true, we fail to see its relevance. The Commission's request, which Congress denied, was a request for authority to engage in prehearing discovery, that is, to exercise subpoena power before the receipt of a complaint or the formal inception of an investigation upon the Commission's own motion. See H.R.Rep. No. 498, 87th Cong., 1st Sess. 22-25 (1961), U.S. Code Congressional and Administrative News 1961, p. 3108. The presence or absence of Commission power to subpoena in such circumstances in not at issue here.
 
 
 19
 To summarize, we hold that Section 27 of the Shipping Act of 1916 authorizes the Commission to exercise its power of subpoena during investigations commenced under Section 18(b)(5) and under provisions like Section 18(b)(5) that give the Commission power to disapprove certain practices in light of broad statutory criteria. It follows that the lower court's decision relating to items (3), (4), and (5) in the subpoenas issued in the present case must be reversed.
 
 III.
 
 20
 The remaining issue is one raised on the cross-appeal by all the respondents except Mordecai Chovers, and relates to the long delay between July 2, 1964, the date on which the underlying investigation into practices of the New York Freight Bureau (Hong Kong) was concluded and May 19, 1965, the date on which the Commission applied to the district court for an order to show cause why respondents should not be compelled to comply fully with the subpoenas issued by the Examiner. Respondents urge us to hold that this delay was unreasonable and that it bars relief. We agree that this aspect of the case appears to be further evidence of the snail-like pace of the administrative process of which this court has had many examples in the past. Nevertheless, much stands in the way of an adoption of the position urged by respondents. First, in every respect the subpoenas were 'regularly made and duly issued.' 29, 46 U.S.C. 828. Second, respondents do not indicate to us how they were prejudiced by this delay; we should think if anyone were prejudiced it would be the competing carriers not under investigation. Finally, the essence of the position urged by respondents is that laches bars the Commission from seeking the relief it seeks in this proceeding. This position is in direct conflict with the apparently well-settled rule that 'the United States is exempt from statutes of limitations and the defense of laches unless Congress provides otherwise * * *.' United States v. 93 Court Corp., 350 F.2d 386, 388 (2 Cir. 1965), cert. denied, 382 U.S. 984, 86 S.Ct. 560, 15 L.Ed.2d 473 (1966).
 
 
 21
 Therefore, we hold that despite this unfortunate delay the lower court's order that the respondents comply with items (1) and (2) of the subpoenas issued in connection with the underlying investigation in this proceeding was proper.
 
 
 22
 We remand to the district court and order that in enforce full compliance with the subpoenas duces tecum.
 
 
 23
 FRIENDLY, Circuit Judge (concurring).
 
 
 24
 The precise issue on the Commission's appeal is whether 27 of the Shipping Act, 46 U.S.C. 826, authorizing it to issue subpoenas 'for the purpse of investigating alleged violations' of the act, includes an investigation to determine whether a rate in foreign commerce is 'so unreasonably high or law as to be detrimental to the commerce of the United States' and thus to require disapproval under 18(b)(5) added in 1961, 46 U.S.C. 817(b)(5). If the words are read in their natural meaning, the answer is in the affirmative and, as shown in Judge Waterman's thorough opinion, this becomes plainer still when we consider their source. Respondents' argument that by speaking of 'violations' Congress meant to limit the subpoena power to cases where conduct might have given rise to a claim for past wrongs as distinguished from a future prohibition finds no basis in language, in history or in good sense. I therefore see no need for extended and perhaps debatable discussion of the framework of the Shipping Act or for deciding whether the subpoenas would have been valid under the legislation prior to 1961 as incidental to the Commission's powers under 15, 46 U.S.C. 814, to disapprove the conference agreement itself as operating to the detriment of the commerce of the United States-- action which the Commission has not suggested here.
 
 
 
 [1]
 46 U.S.C. 826. Section 27 provides in pertinent part that 'For the purpose of investigating alleged violations of this chapter, the Federal Maritime Board may be subpoena compel the attendance of witnesses and the production of books, papers, documents, and other evidence from any place in the United States at any designated place of hearing.' The regulatory agency established by the Shipping Act of 1916 was called the Shipping Board and many of the 1916 provisions refer to the 'Board.' In 1933 the Board became the Shipping Board Bureau, which was followed in 1936 by the United States Maritime Commission, which was succeeded in 1950 by the Federal Maritime Board, which in turn gave way in 1961 to the Federal Maritime Commission. In this opinion the Shipping Board and its successors are collectively termed the 'Commission.'
 
 
 [2]
 The number of respondents was reduced to 39 at the time of the beginning of the hearings held on April 1, 1964
 
 
 [3]
 46 U.S.C. 821. Section 22 provides in pertinent part that 'Any person may file with the Federal Maritime Board a sworn complaint setting forth any violation of this chapter by a common carrier by water * * *
 'The Board, upon its own motion, may in lkie manner and, except as to orders for the payment of money, with the same powers, investigate any violation of this chapter.'
 
 
 [4]
 A 'trade' is a group of routes linking one geographical area to another. See Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635 (1965)
 
 
 [5]
 46 U.S.C. 817(b)(5). Section 18(b)(5) states that 'The Commission shall disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States.'
 
 
 [6]
 46 U.S.C. 821, 815, 816
 
 
 [7]
 46 U.S.C. 817(b)(3)
 
 
 [8]
 Hearing Counsel represents the public interest in proceedings before the Commission
 
 
 [9]
 See note 1 supra
 
 
 [10]
 The Presiding Examiner granted the application for the subpoenas to the extent the documents sought were located within the United States and neither the Hearing Counsel nor the Commission has attempted to expand the geographic scope of the subpoenas. Thus the geographic reach of the Commission's subpoena is not involved here. Twenty of the respondents, objecting to the Examiner's ruling, carried their objections through the steps of administrative reconsideration and review, and, eventually, to the Commission itself, where, at long last, respondents' final motion for review was denied
 
 
 [11]
 The Commission claims it referred the enforcement of the subpoenas to the Attorney General on July 9, 1964
 
 
 [12]
 Rule 16(c) of the Federal Maritime Commission's Rules of Practice and Procedure provides that: 'At any time prior to the filing of his initial or recommended decision, the presiding officer, either upon petition or upon his own initiative may, for good cause shown and upon reasonable notice, reopen the case for the receipt of further evidence.' The Hearing Examiner wisely realized that if the subpoenas were to be enforced in their entirety the case should be reopened because much more relevant material would be available
 
 
 [13]
 46 U.S.C. 828
 
 
 [14]
 Portions of all these statute provisions describe certain objectionable anticompetitive practices as 'violations' of the Act
 
 
 [15]
 46 U.S.C. 801
 
 
 [16]
 46 U.S.C. 812
 
 
 [17]
 46 U.S.C. 815
 
 
 [18]
 46 U.S.C. 814. Under the terms of Section 15 an approved conference receives limited legislative permission to engage in certain forms of activity that would otherwise be unlawful under the antitrust laws. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). Commission approval of the enabling agreement does not insulate the particular acts taken pursuant to that agreement, such as the charging of specific rates, from the substantive standards set forth in the Shipping Act, including Section 15's standards that authorize the Commission after notice and hearing to 'disapprove, cancel or modify any agreement * * * that it finds to be unjustly discriminatory or unfair * * * or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest * * *.' Section 15 directs the Commission to disapprove conference agreements that violate these broad statutory criteria 'whether or not previously approved by it' and thus necessarily imposes a continuing duty upon the Commission to insure that the parties to Section 15 agreements at all times comply with the Act
 To be sure, the Maritime Commission rarely, if ever, utilized Section 15 to regulate conference conduct under an approved agreement. Nevertheless, we think it reasonably clear that the Commission could have regulated conference conduct under an approved agreement, pursuant to Section 15 of the 1916 Act.
 
 
 [19]
 Section 12 investigations are presently handled by the Maritime Administration which under 46 U.S.C. 1124(a) has broad subpoena powers
 
 
 [20]
 See note 3 supra
 
 
 [21]
 See note 18 supra
 
 
 [22]
 See text accompanying notes 15-18 supra
 
 
 [23]
 The investigations referred to in text are instead authorized by Sections 12 and 26
 
 
 [24]
 See text accompanying notes 15-18 supra
 
 
 [25]
 Section 18(b)(6) states that 'Whoever violates any provision of this section shall be liable to a penalty of not more than $1,000 for each day such violation continues; to be recovered by the United States in a civil action.' 46 U.S.C. 817(b)(6)
 
 
 [26]
 Of course the reasonableness of a rate is just as close a question irrespective of whether it is in foreign commerce or in interstate commerce. Congress presumably decided, however, that foreign carriers should be treated with special fairness and thus subjected foreign carriers to penalties only prospectively