**FEDERAL MARITIME COMMISSION,**
Petitioner-Appellee,
and
Ludlow Corporation, Intervenor-Appellee,
v.
A. T. DeSMEDT, President, American Export Isbrandtsen Lines, Inc., American Export Lines, et al., Respondents-Appellants.

Nos. 363–364, Dockets 30321, 30322.

United States Court of Appeals Second Circuit.

Argued March 31, 1966.

Decided Aug. 29, 1966.

Certiorari Denied Dec. 5, 1966.

See 87 S.Ct. 513.

268 U.S. 234, 238, 45 S.Ct. 489, 69 L.Ed. 932, 40 A.L.R. 1094.

Moore, Circuit Judge, dissented.

David L. Rose, Atty., Dept. of Justice, J. William Doolittle, Acting Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., Jack H. Weiner, Atty., Dept. of Justice, James L. Pimper, Gen. Counsel, H. B. Mutter, Acting Sol., Federal Maritime Commission, for appellee Federal Maritime Commission.

Peter J. Nickles, Covington & Burling, Washington, D. C., for appellee Ludlow Corp.

John J. Williams, Kirlin, Campbell & Keating, Elmer C. Maddy, New York City, for respondents-appellants.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

This action was commenced in the District Court for the Southern District of New York by the Federal Maritime Commission (hereinafter the Commission) to enforce subpoenas *duces tecum* issued pursuant to Section 27 of the Shipping Act of 1916, 46 U.S.C. § 826,[1] to Respondents-Appellants (hereinafter Respondents). Each of the respondents is either an officer or an agent of certain common carriers by water, which in turn are all members of the Calcutta, East Coast of India and East Pakistan/U. S. A. Conference (the Calcutta Conference) engaged in the transportation of commodities by water from East India and Pakistan ports to United States Atlantic and Gulf of Mexico ports.

On July 6, 1965 the Calcutta Conference filed with the Federal Maritime Commission notice of a general across-the-board rate increase to become effective as of October 11, 1965. Shortly thereafter Ludlow Corporation, a shipper of jute and jute products from Indian ports served by the Calcutta Conference and obligated by virtue of a dual-rate contract to ship all of its imports with member carriers, filed a formal complaint with the Commission pursuant to Section 22 of the Shipping Act, 46 U.S.C. § 821. The complaint alleged that as of October 11, 1965—the effective date of the Calcutta Conference rate increase— Ludlow faced the payment of ocean transportation rates on certain jute products that were in violation of § 18(b) (5) of the Shipping Act of 1916, 46 U.S.C. § 817(b) (5), as "so unreasonably high * * * as to be detrimental to the commerce of the United States"; of § 15 of the Act, 46 U.S.C. § 814, in that the Calcutta Conference's rate-fixing agreement was being so used as to "operate to the detriment of the commerce of the United States" and "to be contrary to the public interest"; and of § 14b of the Act, 46 U.S.C. § 813a, in that the Calcutta Conference's dual-rate agreement was being so used as to be "detrimental

---

1. The section provides in relevant part as follows:
   "For the purpose of investigating alleged violations of this chapter, the Federal Maritime Board may by subpoena compel the attendance of witnesses and the production of books, papers, documents, and other evidence from any place in the United States at any designated place of hearing * * * *"

to the commerce of the United States" and "contrary to the public interest." [2]

Ludlow first unsuccessfully attempted to secure from the members of the Calcutta Conference on a voluntary basis information it believed relevant to the reasonableness of the increased rates. Thereafter Ludlow applied to the Commission for issuance of subpoenas pursuant to § 27 in order to compel production of this information. This application was granted by the Hearing Examiner on October 18, 1965. Each subpoena was identical in scope and required production for the period covering January 1, 1963 through June 30, 1965 of all records establishing: (1) the total revenue tons of cargo carried; the total gross and net freight revenue earned; the total revenue tons of "Jute Backing for tufted rugs and Jute Mesh in rolls," "Jute bagging for cotton bales covering only," "Jute Yarn," and "Jute Webbing" carried; and the gross and net freight revenue earned from the carriage of these jute commodities; (2) a list of the fifteen commodities carried in the largest volume of revenue tons; the number of revenue tons of each such commodity; a statement of the gross and net freight revenue earned from each; the costs, stated separately, for stevedoring, cargo handling, brokerage fees, and cargo commissions at each of the ports served by the member line's vessels in the covered trade; and whether any of these costs had changed during the relevant period; and (3) the total usable but unused free space available on vessels operated by the member line in the covered trade. For the period covering January 1, 1964 through June 30, 1965 the subpoenas also required production of all records estab-

lishing: (1) the rates applicable to the carriage of cargo, and vessel operating costs, including costs of stevedoring, cargo handling, brokerage fees and other commission; and (2) all correspondence between the member lines concerning policies or principles, or instructions with respect to determining the level of freight rates in the trade covered, both in general and on specific commodities moving in the trade.[3]

On October 19, 1965 the Hearing Examiner issued a "Clarification of Ruling on Application for Subpoena Duces Tecum" to the effect that his initial ruling was not to be construed "to require production of documents from any place not in the United States," because Commission policy required that the Commission itself pass on all requests for documents located abroad. Ludlow then applied to the Commission for issuance of subpoenas relating to documents not in the United States and the application was granted on November 12, 1965.

A hearing on the underlying investigation was scheduled for December 7, 1965 to give respondents time to collect the subpoenaed materials. On December 2, 1965, respondents informed the Hearing Examiner they would not comply with the subpoenas. When hearing was held on December 7, 1965 and respondents failed to appear and produce the materials subpoenaed, the hearing was recessed indefinitely and the Examiner certified to the Commission the fact of respondents' noncompliance. Both Ludlow and the Commission, pursuant to § 29 of the Shipping Act, applied to the court below for enforcement of the subpoenas.[4]

The district court, having first consolidated the two enforcement proceedings,

2. Section 14b legalizes conference use of the dual-rate contract provided that Commission permission be obtained and that the "use of such contract" does not contravene certain standards set forth in that section, including the "detriment to commerce" and the "public interest" standards also found in § 15. See F. M. C. v. Caragher, 364 F.2d 709 (2 Cir. 1966).

3. The subpoenas did not require production of original documents; they could be sat-

isfied with copies of or compilations from the records.

4. Ludlow was allowed to intervene in the enforcement proceeding brought by the Commission. The separate enforcement proceeding brought by Ludlow was consolidated with the proceeding brought by the Commission, rendering moot the question of Ludlow's standing to seek enforcement.

directed full compliance with the subpoenas, see 249 F.Supp. 496. It held that the requirement of § 27 that there be an "alleged violation" of the Shipping Act of 1916 was satisfied by Ludlow's complaint, which alleged that certain practices of the Calcutta Conference violated the standards established by §§ 14b, 15, and 18(b)(5) of the Act. It held that § 27 authorized the Commission to subpoena documents wherever located, and that the words "from any place in the United States" were designed to expand the Commission's subpoena power beyond the territorial limits once imposed by the Judicial Code and presently by Fed.R. Civ.P. 45(e), rather than to restrict the Commission's subpoena power to documents located in the United States. It also held respondents had not objected to relevancy in a timely fashion at the administrative level and, therefore, could not raise that objection before a court. From the order directing compliance with the subpoenas, respondents appeal. We affirm.

■ We need spend little time on several of respondents' contentions. The claim that the Commission lacked § 27 subpoena power in the investigation that has given rise to this proceeding because the practices of the Calcutta Conference, which Ludlow alleged to transgress the standards established by §§ 14b, 15, and 18(b)(5), are not in terms stated in the Shipping Act to be "unlawful," or "violations" of that Act, is substantially the same point unsuccessfully urged in Federal Maritime Commission v. Caragher, 364 F.2d 709 (2 Cir.1966). To be sure, in contrast to *Caragher*, the rates here are challenged as unreasonable and contrary to the public interest by a shipper rather than by a competing carrier, and they are claimed to be unreasonably high rather than unreasonably low. But these are distinctions without a difference; the 1916 Shipping Act and the 1961 amendments were designed to benefit both shippers and carriers. See Note, Rate

Regulation in Ocean Shipping, 78 Harv. L.Rev. 635 (1965). The only other distinction, that here the investigation into the rates charged by a conference was instigated by the filing of a formal complaint with the Commission by an aggrieved party, whereas in *Caragher* the Commission commenced an investigation on its own motion after receiving an informal complaint, also should not lead to any difference in result; as we explained in *Caragher*, 364 F.2d at 709, § 22 expressly gives the Commission identical powers, "except as to orders for the payment of money," in proceedings instituted upon its own motion and in proceedings begun by complaint. These considerations likewise dispose of respondents' argument that the documentary evidence subpoenaed by the Commission is not relevant to the underlying investigation since the Commission does not have the power to establish reasonable rates for the foreign water commerce of the United States, as it does under § 18(a) of the Act for interstate water commerce. The Commission is directed to disapprove unreasonable rates, and cost data and revenue information are highly relevant to that issue. Far East Conference v. Federal Maritime Comm'n, 337 F.2d 146, 150–151 (D.C.Cir.1964), cert. denied sub nom. Pacific Coast European Conference v. Federal Maritime Comm'n, 379 U.S. 991, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965).[5]

The remaining contention, that the Commission is without power to issue a subpoena requiring the production of evidence from outside the United States, is surprising as a matter of common sense. If an ocean shipping line, American or foreign, was defending an ordinary civil action in a district court for damages to persons or property, or prosecuting a suit for unpaid freight, it could not resist discovery under F.R.Civ.P. 34 or obtain the quashing of a subpoena *duces tecum* under F.R.Civ.P. 45 simply on the ground that the desired records were abroad; it would have to show inability to comply

5. We therefore have no occasion to determine whether the issue of relevancy was raised before the Commission in a timely manner.

for some compelling reason, such as a prohibition of production by a foreign government. Cf. Societe Internationale etc. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). The same would be true as to a proceeding before a grand jury, see In re Investigation of World Arrangements with Relation to Production, Transportation, Refining and Distribution of Petroleum, 13 F.R.D. 280, 286 (D.D.C.1952), or before the Internal Revenue Service under § 7602 of the Code, see First Nat'l City Bank v. I.R.S., 271 F.2d 616 (2 Cir.1959), cert. denied, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed. 2d 381, petit. for rehearing denied 362 U.S. 906, 80 S.Ct. 609, 4 L.Ed.2d 557 (1960). Indeed, if the Commission had chosen to proceed in this case under § 21 of the Shipping Act, it could have required that substantially the same information sought in these subpoenas be furnished from foreign countries. See Kerr S.S. Co. v. United States, 284 F.2d 61, 63–64 (2 Cir.1960), appeal dismissed, 369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Montship Lines, Ltd. v. F.M.B., 111 U.S.App.D.C. 160, 295 F.2d 147, 153–154 (1961). It thus requires rather strong evidence to show that Congress wished to render an agency responsible for regulating an important segment of the foreign commerce of the United States powerless to require by subpoena that residents of this country and non-residents doing business here should produce relevant documents simply because these are kept outside our borders.

Respondents argue that the clause in § 27 authorizing the agency by subpoena to "compel the attendance of witnesses and the production of books, papers, documents, and other evidence from any place in the United States at any designated place of hearing," see fn. 1, has such a plain meaning that we must per-

force attribute to Congress a deep-seated intention to reach this irrational result. Faced with the oft-cited decision of SEC v. Minas De Artemisa, S.A., 150 F.2d 215 (9 Cir.1945), see also Mines & Metals Corp. v. SEC, 200 F.2d 317, 320 (9 Cir. 1952), cert. denied, 345 U.S. 941, 73 S.Ct. 832, 97 L.Ed. 1367 (1953), construing a similar provision in § 19(b) of the Securities Act of 1933 as authorizing the SEC to require a resident to produce papers from a foreign country, they contend that case was wrongly decided since the court was in error, as was the district court here, in assuming that the phrase "from any place in the United States" was needed to overcome the territorial limitations of what was then 28 U.S.C. § 654, now F.R.Civ.P. 45(e)—limitations applicable to court subpoenas but not to administrative ones enforced by a court. See Bowles v. Bay of New York Coal & Supply Co., 152 F.2d 330, 331 (2 Cir. 1945). The question is of importance since, as will later appear, respondents' argument would apply not only to the Federal Maritime Commission and the Securities Exchange Commission, but to many other agencies, including the Interstate Commerce Commission, the Federal Trade Commission, the National Labor Relations Board, the Federal Power Commission, the Civil Aeronautics Board, and the Secretary of Agriculture.[6]

■ Respondents' "plain meaning" approach has long since ceased to have this court's adherence; Judge Learned Hand was not preaching novel doctrine when he instructed more than twenty years ago: "There is no surer way to misread any document than to read it literally." Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 624, 155 A.L.R. 761 (1944) (concurring opinion), aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).[7]

---

6. For at least two of these agencies—the Federal Communications Commission and the Civil Aeronautics Board—foreign commerce is a highly important head of jurisdiction.

7. See his statement in 1933: "Thus it is not enough for the judge to use a diction-

ary. If he should do no more, he might come out with a result which every sensible man would recognize to be quite the opposite of what was really intended; which would contradict or leave unfulfilled its plain purpose." The Spirit of Liberty, 106 (1960 ed.); and also Cabell v.

Courts of the United States are not, like Elsa in the Lohengrin legend, forbidden to ask whence something sprang; on the contrary, they are bound to seek out the source of a critical sentence of a statute, as we have recently done in F.M.C. v. Caragher, supra. "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived," Marshall, C. J., in *United States v. Fisher*, 2 Cranch (6 U.S.) 358, 386, 2 L.Ed. 304 (1805). Such inquiry is particularly necessary when a literal reading produces an anomalous result; and courts are not relieved from their duty because counsel have rendered only scant assistance.

As recognized in *Caragher*, § 27 of the Shipping Act of 1916 derived from the pioneer and at that time only federal statute regulating carriers, the Interstate Commerce Act.[8] Section 12 of that statute as originally enacted empowered the ICC "for the purposes of this act" to "require the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation"; to that end it authorized the Commission to invoke the aid of any court of the United States and directed the circuit courts, "in case of contumacy or refusal to obey a subpoena issued to any common carrier subject to the provisions of this act, or other person," to issue an order requiring such common carrier or other person to appear before the Commission and produce books and papers. 24 Stat. 383 (1887). Two years later Congress stiffened the Act in various respects; the relevant provision of § 12 was altered by making express what the original version had implied, namely, that the Commission shall

have power to "require, *by subpoena*, the attendance and testimony of witnesses and the production of all books etc." 25 Stat. 859 (1889).[9] It is plain that these provisions were sufficiently broad to have enabled the ICC to compel production of records from a foreign country if occasion had arisen.

The ancestor of the phrase in § 27 of the Shipping Act to which respondents attribute limiting significance made its first appearance in a further revision of § 12 of the Interstate Commerce Act in 1891, which also provided for the taking of testimony by deposition before various judicial or executive officers or notaries public. The power granted by the statutes of 1887 and 1889 to require the attendance and testimony of witnesses and the production of records by subpoena was left outstanding in all its breadth. But Congress inserted, immediately before the provision authorizing the invocation of judicial aid, a new sentence:

"Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing." 26 Stat. 743–744.

Even if detailed legislative history were lacking, the context would make clear that the purpose of the amendment was to allay doubts rather than raise them. We are not, however, relegated to conjecture; history fully enlightens us as to the legislative purpose. The Commission's Annual Reports for 1889 and 1890 show that Congress was simply responding to requests by the agency to clarify that its subpoena power was not limited to requiring attendance within

---

Markham, 148 F.2d 737, 739–740 (2 Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

8. Congressman Alexander, the sponsor of the shipping legislation, explained on the floor of the House that:

"The provision of Section 27 relating to the power of the board to compel the attendance of witnesses and the pro-

duction of documents and other evidence are also substantially similar to those of the interstate commerce act * * *." 53 Cong.Rec. 8081 (1916). See also H.R.Rep. No. 659, 64th Cong., 1st Sess. 33 (1916).

9. The amendment also authorized a party as well as the Commission to seek judicial aid in enforcing a subpoena.

the district of a witness' residence.[10] Very likely, as the Commission itself recognized, the addition was needless, since, as is now urged by respondents but perhaps was not so clearly apprehended when the first regulatory commission was still a fledgling, the territorial limits on district court subpoenas, then embodied in Rev.Stat. § 876, would not apply to subpoenas issued by an administrative agency. But the history makes it as "plain" as anything can be that the purpose of the new provision, which has had so large a progeny, was to enhance or confirm the powers of the ICC, not to thwart it by allowing parties to Commission proceedings to refuse to produce documents from foreign countries, a problem which was in no one's mind.

■■ It would be wholly unrealistic, in the teeth of the legislative history, see fn. 8, to ascribe any substantive purpose to the drafting change whereby what had been stated in two sentences in § 12 of the Interstate Commerce Act[11] was compressed into one;[12] it is inconceivable that after granting full powers to agencies not having much need for

procuring documents from abroad, Congress should have denied them to one that did—particularly when it placed no such limit on § 21. Congress has said, plainly enough for all to understand, that the Federal Maritime Commission, like the Interstate Commerce Commission, the other regulatory agencies, and the federal courts, can require a resident by subpoena to produce documents under his control wherever they are located, and that, unlike the courts, the agencies can require their production at a place far from home.

Respondents' further arguments based on legislative developments long subsequent to the 1916 enactment are lacking in force. One of these concerns the Merchant Marine Act of 1936. When that statute was passed, the section that empowered the Maritime Commission to conduct investigations pursuant to that Act provided that the Commission was:

* * * empowered to subpena witnesses * * * and require the production of any books, papers, or other documents which are relevant or material to the matter under investigation. Such attendance of witnesses

10. "An amendment to the twelfth section, relating to the attendance of witnesses, and to the taking of testimony by deposition. Objection has been made that the attendance of witnesses can not be required outside of the judicial district in which they reside. The Commission believes the objection is not well founded, and that the law could not be effectually administered under such a rule. As the fact that the objection has been made indicates that obstructions and delays may occur, it is better that the language of the act should be open to no misconstruction." 3 ICC Ann.Rep. 108 (1889).
"It repeats the recommendation contained in the third annual report that the twelfth section be so amended as to make clear the obligation of witnesses to attend before the Commission in obedience to subpoenas regardless of the boundaries of judicial districts, and also that provision be made for the taking of testimony by deposition." 4 ICC Ann.Rep. 68 (1890).

11. The language of the Interstate Commerce Act had been used in § 9 of the Federal Trade Commission Act, 38 Stat. 722 (1914), 15 U.S.C. § 49. This, in turn, was incorporated by reference in the Packers and Stockyards Act of 1921, 7 U.S.C. § 222.

12. Congress reverted to the two sentence formulation of the Interstate Commerce and Federal Trade Commission Acts in such statutes as § 19(b) of the Securities Act of 1933, 15 U.S.C. § 77s (b), § 21 of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(b), § 409 of the Federal Communications Act of 1934, 47 U.S.C. § 409, § 11 of the National Labor Relations Act of 1935, 29 U.S.C. § 161, § 307 of the Federal Power Act of 1935, 16 U.S.C. § 825(f), and § 1004 of the Civil Aeronautics Act of 1938, 52 Stat. 1021, now § 1004 of the Federal Aviation Act, 49 U.S.C. § 1484. The rather obvious reason was the greater familiarity of the legislators with the Interstate Commerce and Federal Trade Commission Acts than with the Shipping Act, which had been little used. See Note, supra, 78 Harv.L.Rev. at 640.

and the production of such books, papers, or other documents may be required from any place in the United States or any Territory, district, or possession thereof at any designated place of hearing within the Federal judicial district in which the witness resides. Merchant Marine Act of 1936, ch. 858, § 214(a), 49 Stat. 1991.

At the instance of the Commission this section's restriction on the place of hearing was deleted by amendment in 1938. The Senate Report urging amendment stated:

> The Commission is given power by section 214(a) of the present act to subpena witnesses for the purpose of any investigation which it may conduct. The attendance of witnesses, however, may only be required within the Federal judicial district in which the witness resides. The amendment removes this limitation.
>
> Authority to require the attendance of witnesses at any place designated by the Commission, enabling it to conduct investigations in the city of Washington when desired, is granted to the Commission by section 27 of the Shipping Act, 1916. Similar power has been granted to the Interstate Commerce Commission, the Federal Trade Commission, and the National Labor Relations Board. No reason appears for a restriction on the authority of the Commission to require the attendance of witnesses for the purposes of any investigation which it may conduct under the provisions of the Merchant Marine Act. The restriction is therefore removed by the amendment. S.Rep. No. 618, 75th Cong., 3d Sess. 6 (1938).

See also Hearings on H. R. 8532 Before the Committee on Merchant Marine and Fisheries, 75th Cong., 2d & 3d Sess. 5 (1938). All that we derive from this is that the "from any place in the United States" language in the 1936 Act was borrowed from the many earlier acts that have been cited, and that the amendment placed hearings under the Merchant Marine Act on the same basis as those under the Shipping Act and other federal regulatory statutes.

■■ Neither can we give significant weight to the failure of Congress, in the legislation of 1961 concerning the dual-rate problem, to adopt recommendations of the Department of Commerce and the Federal Maritime Board which would have made the applicability of both § 21 and § 27 to documents located abroad clear beyond peradventure. These recommendations stemmed from the attack on the applicability of § 21 to documents located abroad which was then pending before the Court of Appeals for the District of Columbia in the *Montship* case and was resolved by it in the Board's favor before the Senate considered the House bill. See Legislative History of the Steamship Conference/Dual Rate Law, S. Doc. No. 100, 87th Cong., 2d Sess. 134, 136–37, 138–39 (1962). The bill passed by the House amended § 15 to provide that no agreement between carriers should be approved unless it contained "provisions that every signatory shall provide records or other information, wherever located, required by any order of the Board which contains the minimum notice provisions required by the Administrative Procedure Act," and similarly amended § 21. Id. at 161.[13] This was recognized as going considerably beyond a clarification of §§ 21 and 27 since it would require a foreign shipping line to pledge the availability of documents irrespective of any orders its own government might give,

13. The House bill as introduced, H.R. 4299, contained an amendment to § 15 providing that no agreement should be approved unless the signatories agreed to "provide records or other information, wherever located, required by any proper order of the Board issued under section 21 hereof" but did not amend § 21, see Legislative History, supra at 61. A revised bill included an amendment of the latter, id. at 84, and the two amendments were carried into H.R. 6775 which was favorably reported and voted. Id. at 91, 97–98; 104, 111; 161, 163. See House Report, id. at 121.

id. at 141–44; the Department of State proposed that if the Congress was unwilling to rely on a solution through diplomatic channels "because of its conviction that documents, wherever located, must be made available," the revision of §§ 15 and 21 should be "deferred while the matter is thoroughly explored to determine how this Government can secure the cooperation of foreign governments in a program which will provide the Federal Maritime Board with the information essential to the performance of its responsibilities." Id. at 143–44. See also Hearings on Steamship Conference/Dual Rate Bill, H. R. 6775, Before the Merchant Marine and Fisheries Subcommittee of the Senate Committee on Commerce, 87th Cong., 1st Sess. 587–88 (1961). It was this change and this alone that was eliminated by the Senate Committee, see Rep. No. 860 in Legislative History, supra, at 223–24, with the subsequent concurrence of the Senate [14] and of the House. We read this history as indicating only a desire by Congress to leave the agency's powers to require production of documents located abroad to extend however far the courts might decide under the existing statute, neither adding thereto nor subtracting therefrom; the lack of intention to renounce power to obtain documents from abroad is implicit in the recognition that the courts of appeal had already upheld the actions taken by the agency under § 21, id. at 224, and the refusal to overrule these decisions by amendment. The Supreme Court has warned against drawing an inference "that an agency admits that it is acting upon a wrong construction by seeking ratification from Congress. Public policy requires that agencies feel free to ask legislation which will terminate or avoid adverse contentions and litigations." Wong Yang Sung v. McGrath, 339 U.S. 33, 47, 70 S.Ct. 445, 453, 94 L.Ed. 616, modified 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950). This is *a fortiori* true when all that has happened is that, at the request of the Department of State to preserve the *status quo*, a committee of one house has rejected an amendment passed by the other which exceeded the clarification the agency had sought.

We are not unmindful of the problems the Federal Maritime Commission may face in endeavors, whether under § 21 or § 27, to require foreign shipping lines to produce documents located abroad. But we are not now confronted with an effort to hold a foreign carrier in contempt or to assess fines for refusing at its government's command to produce documents in response to a subpoena, and we ought not to anticipate that the problem will inevitably arise. Statements as to the adamant and monolithic refusal of foreign governments to permit their carriers to produce copies of records considerably outrun the realities reported by the Department of State to the Senate Committee on Commerce. See Hearings on Steamship Conference Dual Rate Bill, supra at 588–89. A court should not assume that in the long run foreign nations will be wholly unresponsive to requests for information as to the operations of their carriers essential to this country's regulatory processes, which we are quite willing, *mutatis mutandis*, to have our carriers make available to them. Indeed, when the issue is sharply posed, the very foreign carriers that have doubtless had a hand in stimulating the attitudes of their governments may prefer to produce at least some of the desired information than risk disapproval of rates for failure of proof. See Note, Rate Regulation in Ocean Shipping, 78 Harv. L.Rev. 635, 642–44 (1965). From the standpoint of national interest judicial denial of administrative power even to start the process of seeking the information would be the worst possible course; foreign governments would scarcely be impressed by diplomatic suggestions to allow their carriers to furnish information if American courts had already held

---

14. Although Senator Kefauver had prepared amendments that would have restored the provisions of the House bill, these were never called up for action by the Senate. Legislative History, supra at 35–36.

our agencies powerless to secure this under domestic law. In any event, such considerations have no more force as to the construction of § 27 of the Shipping Act than we held them to have with respect to § 21. See Kerr S. S. Co. v. United States, supra, 284 F.2d at 64.

Affirmed.

MOORE, Circuit Judge (dissenting):

I dissent.

When Congress authorized the production of evidence "from any place in the United States," it is to be presumed that it was aware of the territory embraced within the United States. If Congress had intended to enact legislation authorizing such production "from any place in the world," it is again to be presumed that it had available sufficiently skilled legislative draftsmen who could have used "world" instead of "United States"—a not altogether too difficult bit of draftsmanship. The real difficulty which seems to have faced the majority and which requires sixteen pages of history and argument as to how useful world subpoena powers would be, is to demonstrate that the "plain meaning" of "United States" is "world." Even in this day, when these terms appear to be becoming congruous, I find the supposition that Congress could not understand the difference, and hence requires judicial legislation to express its real intent, quite incongruous.

Moreover, the majority's reliance on Kerr Steamship Co. v. United States, 284 F.2d 61 (2d Cir. 1960); see also Montship Lines Ltd. v. FMC, 111 U.S.App. D.C. 160, 295 F.2d 147 (1961), is misplaced since that decision dealt solely with Section 21 of the Shipping Act, and the information-gathering powers of the FMC granted therein are not circumscribed by a congressional directive stating that documents may be obtained "from any place in the United States" such as is contained in Section 27 of the Act, the effect of which is the sole issue here. Nor should any significance be attached to the fact that the same Senate committee which flatly refused in 1961 to expand the FMC's information-gathering powers under Section 27 acknowledged that two United States Courts of Appeal had permitted the FMC to obtain documents located outside the United States pursuant to lawfully issued orders under Section 21. Finally, I consider startling the implication in the majority opinion that considerations of "national interest" and foreign policy should influence this court's view of the subpoena power of an administrative agency. Such matters are without doubt for consideration by the Executive, not the Judicial, branch of government. Cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318–322, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Even the Senate, the advice and consent of which is crucial to certain foreign policy decisions made by the Executive, recognized that the expansion of the FMC's subpoena power under Section 27 in the face of the strongest possible objection from the State Department and explicit directives not to produce documents from numerous friendly maritime nations (including the United Kingdom, Italy and Japan) "would only muddy the waters and do violence to our foreign policy * * *" S.Rep. No. 860, 87th Cong., 1st Sess. (1961), reported in 1961 U.S. Code & Adm. News 3108, 3132.