**FOREIGN STUDY LEAGUE, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**TRANSAMERICA CORPORATION and Trans International Airlines, Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

Nos. 72-1265, 72-1348.

United States Court of Appeals, Tenth Circuit.

March 20, 1973.

David L. Berman, Salt Lake City, Utah (Walter D. Hansen, Washington, D. C., on the brief), for petitioners.

Warren L. Sharfman, Associate Gen. Counsel, CAB (O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey and Paul W. Wallig, CAB, Thomas E. Kauper, Asst. Atty. Gen., Harold E. Shapiro, Dept. of Justice, and R. Tenney Johnson, Gen. Counsel, CAB, Washington, D. C., on the brief), for respondent.

William D. Maroney, New York City, for intervenor, International Studies Assn.

Before HILL and DOYLE, Circuit Judges, and O'CONNOR, District Judge.

HILL, Circuit Judge.

These consolidated Petitions for Review seek to set aside an order of the Civil Aeronautics Board (Board) requiring Transamerica Corporation (Transamerica) to divest its wholly owned subsidiary, the Foreign Study League (FSL). Jurisdiction was asserted by

the Board over Transamerica's 1968 acquisition of FSL under Section 408 [1] of the Federal Aviation Act. The Board concluded that such acquisition was contrary to the "public interest" because Transamerica's common ownership of FSL, a substantial user of chartered air transportation, and Trans International Airlines (TIA), a major United States supplemental air carrier, raised possibilities of anticompetitive consequences.

Petitioners raise both jurisdictional and substantive matters in support of reversal. It is their contention the Board cannot bootstrap its 408(a) statutory jurisdiction over one acquisition so as to require 408 Board approval of a subsequent acquisition over which the Board otherwise would not have 408(a) jurisdiction. Their second argument is that jurisdiction is lacking because FSL is not an indirect air carrier whose acquisition is subject to Board approval under 408(a)(5) [2] of the Federal Aviation Act. The final jurisdiction argument is that although FSL is a substantial user of air transportation, it is not a person engaged in a phase of aeronautics as defined in 408(a)(6).[3] Petitioners then charge that even if the Board has jurisdiction to decide this matter, the Board's decision was rendered under improper legal standards and upon inadequate evidence.

We believe the Board correctly exercised jurisdiction under 408(a) and 408(b) of the Federal Aviation Act and properly found the Transamerica-FSL acquisition to be contrary to the public interest. Because the Board possessed jurisdiction under 408(a) and 408(b) by virtue of the Transamerica-Trans International Airlines acquisition, it will be unnecessary to decide whether FSL was an "indirect air carrier" or "engaged in a phase of aeronautics."

The Foreign Study League is a Utah based corporation sponsoring foreign summer school programs for American students. FSL retains its own faculty, adopts its own curriculum and publishes its own textbooks. High schools in 49 of the 50 states grant credit for completed FSL courses, and several colleges give credit for student participation. Highly respected educators attest to the value of FSL's summer program; and no party to this appeal has questioned its quality.

Since its inception in 1963, FSL has grown rapidly and is now substantially larger than any of its competitors. In 1964 1,920 students participated in the program while five years later the enrollment had mushroomed to nearly 14,000 students. By 1969, FSL described itself as the oldest and largest of the concerns specializing in foreign study-travel business, about as large as all the other foreign study-travel organizations combined.

In 1968 FSL, one of the nation's largest buyers of overseas transportation, was acquired by Transamerica, one of the nation's and world's largest conglomerates. Transamerica has substantial holdings in a large variety of businesses; backing these subsidiaries is the parent company's assets which in 1969 totaled over 3.5 billion dollars.

The other important link in this divestiture suit is Trans International Airlines, which Transamerica acquired in 1968. TIA, one of the largest United States certificated supplemental air carriers, is authorized to operate in the domestic, transatlantic, Caribbean, Central and South American and transpacific markets. When Transamerica elected to acquire TIA in early 1968, both corporations filed a joint application for approval with the Civil Aeronautics Board. This was necessary since Transamerica was engaged in a "phase of aeronautics" and thus required by 408(a)(5) of the Federal Aviation Act to secure Board approval. Following evidentiary hearings, the Board conditionally approved the acquisition. Subsequent to the TIA acquisition, Transamerica acquired the

---

1. 49 U.S.C. § 1378.

2. 49 U.S.C. § 1378(a)(5).

3. 49 U.S.C. § 1378(a)(6).

Foreign Study League. With Transamerica's new acquisition, the Board reopened its record on the Transamerica-TIA acquisition to determine whether the purchase of FSL constituted a change in the Transamerica-TIA relationship. A second reason for reopening the record was to decide whether FSL was an "indirect air carrier" or was "engaged in a phase of aeronautics," thereby subjecting the Transamerica-FSL acquisition independently to § 408(a) [4] jurisdiction.

The Hearing Examiner reasoned that the Board maintained jurisdiction over the Transamerica-FSL acquisition as a result of conditions imposed on the Transamerica-TIA acquisition at time of approval. The Examiner further held that FSL is an indirect air carrier and thereby subject to Board jurisdiction under § 408(a). After settling jurisdictional issues, the Examiner concluded that acquisition of FSL by Transamerica constituted a violation of Section 7 of the Clayton Act with no balancing considerations in the public interest that would warrant approval of the acquisition. On review the Board affirmed the Examiner's decision sustaining jurisdiction. Additionally, the Board held that FSL was engaged in a "phase of aeronautics" thereby subjecting it to Board jurisdiction. The Examiner's determination that the FSL acquisition constituted antitrust violations was rejected, but the Board nevertheless struck it down as creating a "conflict of interest" and therefore contrary to the public interest.

Petitioners first contend the Board lacks jurisdiction to order divestiture of FSL because any statutory jurisdiction over the Transamerica-TIA acquisition does not extend to the purchase of FSL.

Stated another way, the Board may not use the power to condition its approval of a 408(a) acquisition under 408(b) to extend its jurisdictional power to subsequent acquisitions that were not involved in the 408(a) acquisition approved and which do not involve any factors material to the approved 408(a) acquisition. Petitioners charge the conditions imposed in the Transamerica-TIA acquisition are between Transamerica's subsidiary, DeLaval Turbine, a manufacturer of airplane component parts, and TIA, a certificated air carrier. Any subsequent developments in the Transamerica-TIA acquisition concerning the relationship between TIA and FSL have no connection whatsoever with the DeLaval-TIA association.

The Board initially imposed conditions on the Transamerica-TIA acquisition as authorized by 408(b) which states in material part:

> Unless, after such hearing, the Board finds that the . . . acquisition of control will not be consistent with the public interest . . . it shall by order approve such . . . acquisition of control, upon such terms and conditions as it shall find to be just and reasonable with such modifications as it may prescribe. . . .

The Board justifies its divestiture order of FSL by arguing that conditions imposed in the Transamerica-TIA order legitimate the order of divestiture. The condition presently in controversy is condition 8, which states:

> 8. That the Board shall retain jurisdiction over this proceeding for the purpose of:
>
> (1) re-examining at any time the control relationships approved herein; and

---

4. 408(a) It shall be unlawful unless approved by order of the Board as provided in this section—

&ast; &ast; &ast; &ast; &ast;

(5) for any air carrier or person controlling an air carrier, any other common carrier, any person engaged in any other phase of aeronautics, or any other person to acquire control of any

air carrier in any manner whatsoever . . . ;

(6) for any air carrier or person controlling an air carrier to acquire control, in any manner whatsoever, of any person engaged in any phase of aeronautics otherwise than as an air carrier.

(2) imposing at any time, with or without hearing, such other conditions as it may find to be just and reasonable, including the submission of any special reports by applicants or any of their affiliates or subsidiaries that the Board may find required in the public interest.

There is no question the Board can condition its approval of an acquisition if it has jurisdiction over the subject matter. Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Petitioners argue, however, that condition 8 of the Board's order granting Transamerica's acquisition of TIA has no effect on the subsequent FSL acquisition. We do not agree. Technically, the Board's order requiring Transamerica to divest FSL has nothing to do with the Transamerica-FSL acquisition. What the Board is doing is reexamining its approval of the Transamerica-TIA relationship in light of subsequent developments. It is the changed condition of TIA emanating from Transamerica's acquisition of FSL that is subject to Board jurisdiction.

Certainly petitioners would not argue the Board lacked jurisdiction to consider tie-in effects of FSL and TIA if FSL had been acquired prior to TIA. The Board, in fact, is compelled to examine such circumstances before granting its initial approval. Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968). Petitioners nevertheless state that once the initial approval is given, no review of subsequent acquisitions is permitted unless it concerns the DeLaval Turbine-TIA relationship. We do not believe Congress so restricted 408(b). Such an interpretation feeds the hunger of large conglomerates who would thereby enjoy immunity for acquisitions considered not to be in the public interest. A conglomerate could do through its subsidiaries what it cannot do on its own.

Petitioners reject the Board's conclusion that without authority to order divestiture of future acquisitions under 408(b) the Board's jurisdiction is contingent upon the order in which the acquiring party arranges its acquisitions. Petitioners apparently argue that jurisdiction only exists if the Board proves Transamerica had timed their transaction to circumvent the statute, but as no proof of intentional circumvention was presented, 408(b) jurisdiction cannot be invoked. We feel petitioners' argument concedes the point. Jurisdiction does not depend on the parties' intent, but on the statutory objectives to be achieved. By reexamining the Transamerica-TIA acquisition in light of changed circumstances, the Board might reasonably conclude TIA's ownership by Transamerica was no longer in the public interest. Whether or not Transamerica intended to circumvent the statute is irrelevant.

As already emphasized, petitioners' contention that Transamerica's control of FSL has nothing to do with the Transamerica-TIA relationship is not well founded. Transamerica's acquisition of FSL brought under the roof of a single corporation one of the nation's largest supplemental air carriers and the nation's largest buyer of air transportation in the foreign study-travel business. Such a potential tie-in definitely creates possible anticompetitive consequences which must be considered. Denver & Rio Grande Western Railroad Company v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). The Board must determine whether the market structure maximizing competition will be endangered by the changed circumstances in the Transamerica-TIA relationship. National Air Carrier Association v. CAB, 141 U.S.App.D.C. 31, 436 F.2d 185 (1970).

Petitioners sound a note of alarm by asserting that if the Board has discretionary power to exercise jurisdiction over all subsequent transactions involving parties to the original 408(a) acquisition, then all later acquisitions regardless of their connection with the 408 approval may be subject to Board ap-

proval. The result is that if Transamerica buys a motel, the purchase is subject to Board approval. This argument is without merit. There must be some relevant connection between the Board approved acquisition and the subsequent acquisition. In the present case this connection is apparent because now living under the wings of one of the world's largest conglomerates is one of the nation's largest suppliers of chartered aircraft and the nation's largest buyer of air transportation in the foreign study-travel business.

Having determined the Board had jurisdiction to order divestiture of FSL, we now turn to the Board's decision that Transamerica's relationship with TIA and FSL is inconsistent with the public interest standard of § 408. Section 408(b) provides that "[U]nless . . . the Board finds that the . . . acquisition of control will not be consistent with the public interest . . . it shall by order approve such . . . acquisition of control. . . ." Section 408 (b) further provides:

> That the Board shall not approve any consolidation, merger, purchase . . . or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier. . . ."

■ These provisions of § 408(b) compel the Board to make two independent antitrust determinations. First, the Board must determine whether the acquisition has resulted in a monopoly that restrains competition or jeopardizes another carrier. If the Board determines there are no such consequences from the acquisition, it must then determine whether the acquisition results in antitrust violations less drastic than monopoly.

Although the Transamerica-FSL acquisition was not found to constitute a monopoly, the Board felt it did create potential anticompetitive conditions contrary to the public interest. Petitioners respond by charging the Board with improper application of the § 408(b) public interest provision. It is their position that applying a "conflict of interest" standard to determine public interest introduces a phrase foreign to the Federal Aviation Act's language. The result has been findings of fact that would be unsupportable by the record if the Board had correctly applied the public interest standard.[5]

■■ We do not believe a "conflict of interest" test is an improper standard for determining public interest. The Board is vested with statutory authority to determine the overall transportation policy which best serves the interest of the public. To comply with the mandate, the Board must consider such factors as "conflicts of interest."

5. 49 U.S.C. § 1302. Consideration of matters in public interest by Board

In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices;

(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(e) The promotion of safety in air commerce; and

(f) The promotion, encouragement, and development of civil aeronautics.

Congress gave the Board authority to prohibit acquisitions which create monopolization. The Board has correctly determined that this authorization includes anticompetitive effects less extreme than monopolization if against the public interest. Logically, "conflicts of interest" must be considered when determining public interest. Such an interpretation is necessary in light of the immunity from antitrust laws conferred by § 414[6] of acquisitions approved by the Board. Denver & Rio Grande Western Railroad Company v. United States, supra; Seaboard Air Line Railroad Company v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Butler Aviation Company v. CAB, 389 F.2d 517 (2d Cir. 1968).

▇▇▇▇ Our only involvement in the Board's decisions in determining whether there is substantial evidence to support its findings. French v. CAB, 378 F.2d 468 (10th Cir. 1969); 49 U.S.C. § 1486(e). A careful review of the record convinces us there was sufficient evidence for the Board to find the potential TIA-FSL tie-in contrary to public interest.

FSL is the nation's largest foreign study-travel business. There are approximately 17 study-travel organizations competing against FSL; but with the exception of the American Institute for Foreign Study, whose operation is approximately one-half that of FSL's there is no other organization which handles over 1,000 students. The size of FSL has increased substantially since 1963, and with this increase has come a corresponding need for more overseas transportation.

Fear of a tie-in between FSL and TIA is not unfounded in light of the benefits Transamerica could derive from such an association. For example, if all of FSL's charter business were given to TIA, that carrier would have the competitive advantage of a guaranteed base for its transatlantic program. No TIA competitor would enjoy such a guaranteed base. To maximize TIA's competitive advantage, it could schedule FSL charters in such a manner as to position aircraft, thereby eliminating ferry mileage. TIA's benefit would be FSL's burden as not only would flights be chartered around TIA's schedule, but FSL might also be charged a higher price than it could obtain from other carriers.

The converse is also true. Transamerica could require the two companies to operate for FSL's benefit. TIA could be required to give FSL lower rates, thereby unduly strengthening FSL's position in the competitive market. By giving FSL preference in charter scheduling, maximum benefits would be engendered at the expense of competitors.

The potential integration of TIA-FSL is not without factual support. For example, both before and after the acquisition FSL did business with other subsidiaries of Transamerica. Film given to students by FSL could only be processed by a Transamerica subsidiary. FSL's student insurance in 1969 was written by Transamerica's subsidiary Pacific Fidelity Life Insurance Company. The deferred student tuition plan was financed by Transamerica Credit Corporation. Transamerica ran an article about FSL in its employee magazine and transmitted with its quarterly dividend check to its stockholders a small booklet concerning FSL. A television station owned by Transamerica interviewed FSL on its public interview show, and on occasion Transamerica mentioned the name of FSL in its corporate advertising program. Transamerica has advertised FSL in such periodicals as the Wall Street Journal, Time Magazine and Business Week.

Evidence was introduced indicating that when all other factors are equal, subsidiaries of Transamerica do business with each other. Intersubsidiary cooperation, in fact, is encouraged by the parent corporation. As one Transamerica executive stated in a letter to the officers and directors, ". . . we

6. 49 U.S.C. § 1384.

are always looking for ways to scratch each other's back."

The interrelationship between TIA and FSL already has begun. In 1967, the year prior to Transamerica's acquisition of FSL, TIA operated no FSL flights. In each of 1968 and 1969, TIA operated only one transatlantic round trip flight. In 1970, however, TIA operated 16 of the 65 transatlantic round trip flights. This was a jump from about 1.5 percent in 1968 and 1969 to 25 percent in 1970.

In light of Transamerica's policy of encouraging its subsidiaries to work together and more specifically, in light of the potential effects of a TIA-FSL tie-in, we believe the Board's findings of fact were based on substantial evidence and thus we are compelled to affirm its orders.