**KERR STEAMSHIP COMPANY, Inc.,**
**et al., Petitioners,**

v.

**UNITED STATES of America and Federal Maritime Board, Respondents.**

Nos. 122, 123, Dockets 26334, 26429.

United States Court of Appeals
Second Circuit.

Argued Sept. 30, 1960.

Decided Oct. 31, 1960.

Elkan Turk, Jr., Brooklyn, N. Y., Herman Goldman, New York City, for petitioners; Elkan Turk, Sol. D. Bromberg, New York City, of counsel.

Edward Aptaker, Robert A. Bicks, Acting Asst. Atty. Gen., Richard A. Solomon, Atty., Dept. of Justice, E. Robert Seaver, Gen. Counsel, Robert E. Mitchell, John E. Cograve, Attys., Federal Maritime Board, Washington, D. C., for respondents.

Before LUMBARD, Chief Judge, and HAND and FRIENDLY, Circuit Judges.

HAND, Circuit Judge.

This is a joint appeal in the form of a petition to review several orders of the Federal Maritime Board under § 21 of the Shipping Act of 1916, which required a number of common carriers by water to file "a list identifying every contract * * * involving the water-borne commerce of the United States" which they had made "with any other common carrier by water * * * or with any freight forwarder, terminal operator, stevedore, or ship's agent * * * which relates or pertains to" seven specified activities in the "commerce of the United States." The orders also required a "copy" to be filed of every "contract" so identified, of which the carrier had not already filed a copy and added that if "any such contract * * * is oral, it shall be set forth in a memorandum in sufficient detail to represent a true and complete record of the contract."

The first question raised is whether § 21 [1] on which the orders pur-

---

1. Section 21. That the board may require any common carrier by water, or other person subject to this Act, or any officer, receiver, trustee, lessee, agent, or em-

port to rest supports them. Section 15 of the Act requires all "water borne" carriers to file with the Board contracts made between them and other such carriers, or between a carrier and any other "person subject to this Act," whom § 1 of the Act, defines as anyone not a carrier, "carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." Thus it would seem that, so far as concerns contracts between the carriers themselves and other "persons subject to the Act," § 21 was not necessary; such contracts fell within § 15. The petitioners argue that for this reason we should not hold that the "transactions" as used in § 21 included "contracts between carriers." That would seem to us a wanton perversion of the natural meaning of the words, even if both sections had the same scope. Every "contract" presupposes a "transaction," for it results from some mutual dealing between the parties, and to limit its scope to such dealings as do not result in a contract would, especially in this setting, do the utmost violence to its normal meaning. Any significance of the substitution of "transaction" in § 21 as a limitation disappears when we remember that that section covers more than "contracts," and in addition that it covers more contracts than those covered by § 15. There is likewise no significance in the provision of § 407(a) of the Federal Aviation Act of 1958, 49 U.S.C.A. § 1377(a), which was previously in the same section of the Civil Aeronautics Act of 1938, empowering the Civil Aeronautics Board to "require any air carrier to file with it a true copy of each or any contract, agreement, understanding, or arrangement, between such air carrier and any other carrier or person, in relation to any traffic affected by the provisions of this chapter." Since the Aviation Act contains no provision of the breadth of § 21 of the Shipping Act, the specific grant to the Civil Aeronautics Board of the power to require the filing of contracts of air carriers implied no recognition that the general language of § 21 had not conferred such a power upon the Maritime Board with respect to carriers by water.

■ Nor can we agree that the orders were too vague to be valid. It is of course true that they are in general terms and that their ambit is not defined with verbal exactness; but precisely limited demands would have been impossible in an investigation of the kind proposed. Decisions of a carrier as to what "transactions" were within the orders if made in good faith, would not necessarily result in fines of $100 a day, although the court disagreed with the carrier's understanding of what "transactions" were covered. It appears to us that the orders are as definite as the subject-matter permitted, and did not impose any unreasonable risk upon a carrier who in good faith should submit all contracts that seemed to it to be within the intent of the orders.

■ Next, the petitioners complain that the orders were beyond the competence of the Board because they required the petitioners to produce copies of contracts that were outside the United States. It is to be noted in the first place that the orders do not require the

ployee thereof, to file with it any periodical or special report, or any account, record, rate, or charge, or any memorandum of any facts and transactions appertaining to the business of such carrier or other person subject to this Act. Such report, account, record, rate, charge, or memorandum shall be under oath whenever the board so requires, and shall be furnished in the form and within the time prescribed by the Board. Whoever fails to file any report, account, record, rate, charge, or memorandum as required by this section shall forfeit to the United States the sum of $100 for each day of such default.

Whoever willfully falsifies, destroys, mutilates, or alters any such report, account, record, rate, charge, or memorandum, or willfully files a false report, account, record, rate, charge, or memorandum shall be guilty of a misdemeanor, and subject upon conviction of a fine of not more than $1,000, or imprisonment for not more than one year, or to both such fine and imprisonment.

production of the original "memorandums" of contracts with other carriers, but only copies. Even were we to assume for argument, which we do not mean to suggest, that the Board could not have demanded production and inspection of such originals if they were outside the United States, that is not the question before us. The investigation was to acquaint the Board with what were the practices of carriers engaged in commerce with the United States, and it was essential to that purpose to know what took place outside the United States as well as inside. Nobody would argue, we should suppose, that oral agreements made in other countries could have no effect upon the commerce of the United States, which was the subject being investigated. The Board could not proceed unless it found out what were the arrangements between carriers and between a carrier and others who took part in its preparations, no matter where the "transactions" occurred. It would be absurd, for example, to hold that the Board had no power to examine a witness as to what had been agreed abroad, if that was relevant to the terms and conditions of the eventual carriage. We can see no valid distinction between such an inquiry and the production of a copy of the agreement—"transaction"—in which those concerned formulated their obligations. The extent to which the information could be forcibly elicited is another matter, not in the least relevant to whether it may be lawfully demanded. Sections 27 and 29 provide other procedure, but not necessarily to the exclusion of an action under § 15 or § 21. The process by which an order is to be enforced is one thing, its validity is another.

■ Next, the petitioners argue that to require them to prepare and file copies of all their "transactions" in foreign commerce would violate their constitutional protection from unlawful search and seizure. It is true that the order of such a tribunal as the Board may be so burdensome as to require modification (United States v. Morton Salt Co., 1950, 338 U.S. 632, 651–654, 70 S.St. 357, 94 L.Ed. 401) and that even in the case of corporations, its discretion is not beyond any judicial review whatever. But "corporations can claim no equality with individuals in the enjoyment of a right to privacy" (338 U.S. at page 652, 70 S.Ct. at page 368). "Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest" (338 U.S. at page 652, 70 S.Ct. at page 369). It does not appear that any of the petitioners tried to show what was the financial burden of listing and copying the contracts in question, or that it was out of all reasonable proportion to any purpose that the proposed investigation might have. Until it did, the carrier could not resist complete disclosure; and, if it did, it could resist only so much as it proved to be unreasonable.

■ Nor does the accompanying complaint impress us any more: that is, that an omnibus disclosure of the kind demanded might include secret arrangements between carriers, or a carrier and another person whether or not he was "subject to the Act." That was presumably one of the purposes of the whole investigation, and it is strange indeed to have it argued that a common carrier, may refuse to tell what are its secret agreements with others engaged in the enterprise, when the inquiry was to learn among other things what those secret arrangements were, and how far they might trench upon that freedom of commerce that it was one of the purposes of the Act to secure. If such an inquiry annoys other governments, as apparently it does, their complaint must be addressed to the Executive; it is not a matter with which courts have any power to deal.

Petitions denied.