**ARMEMENT DEPPE, S. A., et al.,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 24427.

United States Court of Appeals
Fifth Circuit.

Aug. 8, 1968.

---

the Continent of Europe to United States Gulf ports. They moved to dismiss for lack of jurisdiction over the subject matter of the complaint, this civil action brought by the United States under Sections 14b and 15 of the Shipping Act of 1916 as amended (46 U.S.C. §§ 813a, 814), to recover penalties for violations of the Act.[1]

This is an interlocutory appeal under 28 U.S.C. § 1292(b) from the denial by the District Court of the motion to dismiss.[2]

In 1958, the Supreme Court held in Federal Maritime Board v. Isbrandtsen Company, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), that the dual-rate (exclusive patronage) contract system of ocean common carriers and conferences violated the Shipping Act of 1916 and was a "resort to other discriminating or unfair methods" prohibited by the Act. 356 U.S. at 493, 78 S.Ct. at 859. The decision was far reaching and disturbing in its effect in the maritime industry, and Congress in 1961 enacted legislation amending the Shipping Act of 1916 by adding a new section, 14b,[3]

Leonard G. James, San Francisco, Cal., Donald A. Lindquist, New Orleans, La., F. Conger Fawcett, San Francisco, Cal., for appellants.

David L. Rose, Norman Knopf, Stephen R. Felson, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellants are nine foreign common carrier steamship lines, which were members of the Continental-U.S.A. Gulf Westbound Freight Conference, engaged in the operation of ocean vessels from

---

1. The complaint as originally brought also included three American-flag lines, also members of the Conference, but these claims have been compromised and dismissed with prejudice.

2. We granted leave to appeal under 28 U.S.C. § 1292(b) by our order of January 24, 1967.

3. Section 14b (46 U.S.C. § 813a) is as follows:

   "Notwithstanding any other provisions of this chapter, on application the Federal Maritime Commission (hereinafter 'Commission'), shall, after notice, and hearing, by order, permit the use by any common carrier or conference of such carriers in foreign commerce of any contract, amendment, or modification thereof, which is available to all shippers and consignees on equal terms and conditions, which provides lower rates to a shipper or consignee who agrees to give all or any fixed portion of his patronage to such carrier or conference of carriers unless the Commission finds that the contract, amendment, or modification thereof will be detrimental to the commerce of the Unit-

   ed States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, and provided the contract, amendment, or modification thereof, expressly (1) permits prompt release of the contract shipper from the contract with respect to any shipment or shipments for which the contracting carrier or conference of carriers cannot provide as much space as the contract shipper shall require on reasonable notice; (2) provides that whenever a tariff rate for the carriage of goods under the contract becomes effective, insofar as it is under the control of the carrier or conference of carriers, it shall not be increased before a reasonable period, but in no case less than ninety days; (3) covers only those goods of the contract shipper as to the shipment of which he has the legal right at the time of shipment to select the carrier: *Provided, however*, That it shall be deemed a breach of the contract if, before the time of shipment and with the intent to avoid

by the terms of which the use of dual-rate contracts was permitted under certain conditions. A dual-rate contract system is one under which shippers, by agreement, tender all or any fixed portion of their cargo destined for certain designated American ports to conference carriers, as a result of which they pay a lower rate for the shipping of commodities than other shippers.

Under the new Section 14b of the Shipping Act of 1916 as amended, conference carriers in American foreign commerce were required to amend their shipper contracts by including the eight substantive provisions set out in Section 14b, and to obtain approval thereof by the Federal Maritime Commission.

Otherwise, such dual-rate contracts would be unlawful and expose the violator to a penalty of $1,000 per day for each violation of Section 14b, to be recovered by the United States in a civil action as provided in Section 15 of the said Act as amended (46 U.S.C. § 814). Under terms of the new amendments to the Shipping Act, a grace period of one year for contracts amended in accordance with the new provisions was granted, provided they were filed with the Commission within six months after the enactment of the statute which occurred on October 3, 1961. Appellants failed to amend and obtain approval from the Federal Maritime Commission of their dual-rate contracts in accordance with

his obligation under the contract, the contract shipper divests himself, or with the same intent permits himself to be divested, of the legal right to select the carrier and the shipment is carried by a carrier which is not a party to the contract; (4) does not require the contract shipper to divert shipment of goods from natural routings not served by the carrier or conference of carriers where direct carriage is available; (5) limits damages recoverable for breach by either party to actual damages to be determined after breach in accordance with the principles of contract law: *Provided, however*, That the contract may specify that in the case of a breach by a contract shipper the damages may be an amount not exceeding the freight charges computed at the contract rate on the particular shipment, less the cost of handling; (6) permits the contract shipper to terminate at any time without penalty upon ninety days' notice; (7) provides for a spread between ordinary rates and rates charged contract shippers which the Commission finds to be reasonable in all the circumstances but which spread shall in no event be more than 15 per centum of the ordinary rates; (8) excludes cargo of the contract shippers which is loaded and carried in bulk without mark or count except liquid bulk cargoes, other than chemicals, in less than full shipload lots: *Provided, however*, That upon finding that economic factors so warrant, the Commission may exclude from the contract any commodity subject to the foregoing exception; and (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit. The Commission shall withdraw permission which it has granted under the authority contained in this section for the use of any contract if it finds, after notice and hearing, that the use of such contract is detrimental to the commerce of the United States or contrary to the public interest, or is unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors. The carrier or conference of carriers may on ninety days' notice terminate without penalty the contract rate system herein authorized, in whole or with respect to any commodity: *Provided, however*, That after such termination the carrier or conference of carriers may not reinstitute such contract rate system or part thereof so terminated without prior permission by the Commission in accordance with the provisions of this section. Any contract, amendment, or modification of any contract not permitted by the Commission shall be unlawful, and contracts, amendments, and modifications shall be lawful only when and as long as permitted by the Commission; before permission is granted or after permission is withdrawn it shall be unlawful to carry out in whole or in part, directly or indirectly, any such contract, amendment, or modification. As used in this section, the term 'contract shipper' means a person other than a carrier or conference of carriers who is a party to a contract the use of which may be permitted under this section."

the new amendments to the law, by the required date of April 3, 1962. On August 15, 1962, they dissolved their Conference and terminated the dual-rate contracts. Thus the United States is seeking to recover penalties in this civil action for the period April 3, 1962, to August 15, 1962, at the rate of $1,000 for each day of a violation by each carrier.

We are called upon to decide whether Congress may enact a statute which gives the United States jurisdiction over foreign shipowners and their shipping contracts in the transportation of commodities to American ports in foreign commerce, which may subject such foreign shipowners to penalties for violation of the statutory provisions due to noncompliance; and if such jurisdiction is permissible, whether Sections 14b and 15 of the Shipping Act of 1916 as amended, were intended by Congress to be applicable to such contracts and foreign-flag shipping lines transporting commodities to American ports in foreign commerce.

## I.

■ It is well settled that when a foreign-flag shipping line chooses to engage in foreign commerce and use American ports it is amenable to the jurisdiction of the United States and subject to the laws thereof. The Schooner Exchange v. M'Faddon and Others, 7 Cranch 116, 3 L.Ed. 287 (1813). This time-honored principle was reiterated in the "Wildenhus's Case," Mali v. Keeper of the Common Jail, 120 U.S. 1, 11, 7 S.Ct. 385, 387, 30 L.Ed. 565 (1887), in the following language: "It is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place

to which it goes, unless, by treaty or otherwise, the two countries have come to some different understanding or agreement. * * *" Later the Supreme Court said in Benz v. Compania Naviera Hidalgo, S. A., 353 U.S. 138, 142, 77 S.Ct. 699, 701, 702, 1 L.Ed.2d 709 (1957), "It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country. * * *" In Lauritzen v. Larsen, 345 U.S. 571, 592, 73 S.Ct. 921, 933, 97 L.Ed. 1254 (1953), it was held that Congress may "condition access to our ports by foreign-owned vessels upon submission to any liabilities it may consider good American policy to exact."

Appellants find no fault with the foregoing principles and in their reply brief admit that the United States has the "power" to exclude foreign vessels from United States ports and, correspondingly, to condition their entry into United States ports; that the conduct of foreign vessels is subject to United States law while they are "within U. S. ports"; and that contracts of foreign shipowners, wherever executed, may be governed by United States law when they are performed or effectuated "within the U. S."

But appellants contend that these principles are not at issue here. They state that the Government has admitted "that nothing more than the 'tender' of the shippers' cargo was involved in the contracts,"[4] and contend that "Nothing could have been done under the contracts, by any party, outside the territorial waters of a Continental port in Europe." They attempt thereby to impress us that so far as the dual-rate contracts are concerned, they were completed in a foreign country when tender of shipments was made by foreign ship-

---

4. It is doubtful that the Government's brief at the place referred to constitutes an admission. The brief states: "At all pertinent times the conference employed a 'dual-rate contract system' under which shippers who agreed to tender all of their cargo destined for the designated American ports to conference carriers paid a lower rate than other shippers (R. 2, 81)."

pers to foreign carriers.[5] Appellants contend, therefore, that all of the dual-rate contracts here involved are by foreign shipowners with foreign shippers and that the Shipping Act of 1916 as amended, cannot have extraterritorial effect in relation to these foreign nationals. But they thus ignore the provisions of their own dual-rate contracts and the plain language of Section 14b. The sample contract in the record discloses that the merchant who contracts with the carriers agrees to transport all of his commodities to United States Gulf ports from Europe, using Conference carriers, and that the failure to do so is a violation of the contract. By the terms of the contract (para. 1) "the Merchant agrees to offer, or cause to be offered to the Carriers *for transportation by them to the United States* through any port * * * in the Gulf of Mexico * * * all shipments of the commodities mentioned. * * *"[6] (Emphasis added.)

As the United States points out, its complaint in this case charges appellants with *"employing* a dual-rate system not amended to comply with Section 14b of the Shipping Act of 1916 * * *." (para. 10). The Government urges that the amended statute refers to *"the use* by any common carrier or conference of such carriers in foreign commerce of any contract" not conforming to the Act and the applicable section states that "it shall be unlawful *to carry out"* any such contract (Section 14b). (Emphasis added.)

We have no difficulty, therefore, holding that under the power which Congress has to regulate commerce with foreign nations under Art. I, § 8 of the Constitution, it has authority to enact laws regulating the shipping contracts of foreign-owned shipping lines regardless of the fact that the contracts are executed in foreign countries with foreign nationals, inasmuch as the contracts are to be used, employed, and carried out in American foreign commerce in the delivery of goods to American ports. Consummation of the contracts is, therefore, by acts which are ultimate-

5. The affidavit of Mr. Loots attached to appellants' motion for reconsideration of the denial of the motion to dismiss avers that affiant served as Secretary of the Continental Gulf Westbound Freight Conference and executed contracts with shippers in behalf of the Conference members; that such contracts were executed at the office of the Conference in Antwerp, Belgium, and the great majority were exporting companies organized in Austria, Belgium, Denmark, England, France, Germany, Holland, Hungary, Luxembourg and Switzerland. Mr. Loots further averred that the Conference records contained a number of contracts executed with American companies but stated his conclusion that "Since our contracts covered only the shipment of European products, from European ports, all contract shippers were European shippers in their relations with the Conference members, regardless of the country in which they were organized and of their principal place of business".

6. The full text of pertinent provisions of the sample contract is as follows:
"1. In consideration of the rates and other conditions stated herein, the Merchant agrees to offer, or cause to be offered to the Carriers *for transportation by them to the United States* through any port or waterway in the Gulf of Mexico in the range from Tampa, Florida to Brownsville, Texas, both included and discharge [sic] at such ports of said range served by the Carriers as may be designated by the Merchant, all shipments of the commodities mentioned (or provided) below.
"2. *This contract covers all export shipments of the merchant* of the herein named (or provided for) commodities *moving out of Continental European ports* between Hamburg and Bayonne, both inclusive, *to or through ports of aforesaid United States Gulf of Mexico range* and all said shipments shall be tendered to the Carriers for their vessels which may load at Continental European ports between Hamburg and Bayonne, both inclusive, and scheduled to sail to the port of destination designated by the merchant, and failure so to tender such shipments to the Carriers or shipment of them by vessels other than those of the Carriers, shall be a violation of this contract. *The Carriers agree,* subject to provisions hereof, *to transport said shipments on their vessels sailing to the aforesaid ports."* (Emphasis added.)

ly performed in the United States—thus making them subject to the laws of this nation. The only logical conclusion fairly to be reached is that foreign-owned ships which use our American ports must comply with the laws of the United States in connection with shipping contracts and specifically with the employing of the dual-rate contract system.[7]

..II...

The historical background for the enactment of Sections 14b and 15 of the Shipping Act of 1916 as amended, by Congress in 1961, gives clear evidence of the intention to apply the provisions of the Act to foreign-owned shipping lines. The amendments to the Shipping Act directly flowed from the Supreme Court's decision in Federal Maritime Board v. Isbrandtsen Company, supra, the purpose being to legislatively overrule that decision under certain limitations and restrictions provided for in the new enactment. The legislative history indicates that foreign-flag vessel owners sent their representatives to the congressional hearings on the bills and objected to having these penalty provisions apply to foreign-flag shipowners. However, no exception was made in the Act for foreign-flag shipowners, and the terms of the applicable sections regulate all common carriers or conferences, foreign or American, using a dual-rate contract system, which are engaged in American foreign commerce and use American ports.[8]

We observe no determination by Congress to limit the application of these regulatory provisions to American exporters or importers, as contended by appellants, or that Congress was concerned only with shippers and consignees contracting in the United States. The dual-rate contract system would be largely unworkable and impractical if so restricted. Foreign-flag shipowners dominate most conferences and it is said that American carriers "account for only a small vote in virtually every important conference serving our foreign trade."[9]

---

7. "It seems clear that no principle of international law forbids full implementation of the Shipping Act as amended in 1961. Contrary to the protests of foreign shipowners that the United States lacks 'jurisdiction' to regulate extraterritorially, the trend of the law today upholds such regulation." Jack, Self-Policing of Ocean Shipping Conferences, 20 Stanford L.Rev. 724, 729 (1968). See also, Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635, 641, 642 (1965).

8. Both appellants and appellee quote extensively from the legislative history as it developed in House and Senate proceedings when the amendment to the Shipping Act of 1916 (H.R. 6775) were being considered. We are satisfied from reviewing the cited portions of the Congressional Record that Congress intended to make the new provisions relating to dual-rate contracts apply to all shipowners, foreign and American, and that the Act was passed over the strong opposition of foreign shipowners appearing through their chosen representatives and counsel. The citations to legislative history are too numerous to mention here; several references are pertinent: Ocean Common Carriers—Dual Rate Contracts, 87th Cong., 1st Sess., 1961 U.S. Code Cong. & Adm.News 3108; Providing for the Operation of Steamship Conferences, House Report No. 498, June 8, 1961, to accompany H.R. 6775; 107 Cong.Rec. 19305 (1961) (Senator Engle); 107 Cong.Rec. 21143 (1961) (Senator Engle); 107 Cong.Rec. 19310 (1961); 3 Hearings Before the House Committee on Merchant Marine & Fisheries, 87th Cong., 1st Sess., 233 (1961); 4 Hearings Before the Merchant Marine & Fisheries Subcom. of the Senate Com. on Commerce, 87th Cong., 1st Sess., pt. 1 at 126.

9. Ocean Common Carriers—Dual Rate Contracts, 87th Cong., 1st Sess., 1961 U.S.Code Cong. & Adm.News, p. 3108, at p. 3139. Of 62 conferences with dual-rate contracts, in only 5 were American-flag lines in the majority. Foreign lines usually predominated. E. g., in Associated Steamship Lines (Manila) there were 50 foreign-flag lines and 8 American; Association of West Coast Steamship Companies, 14 foreign and 2 American; Brazil-United States-Canada Freight Conference, 13 foreign and 2 American; Camexco Freight Conference, 13 foreign and 1 American; North Atlantic Baltic Freight Conference, 18 for-

800

In the Continental-U.S.A. Gulf West-bound Freight Conference, with which we are concerned here, only three of the twelve carrier members were American carriers. It would be an odd result if three of the members observed Section 14b requirements, while the nine other foreign-flag members were completely unrestricted in their employment of dual-rate contracts in the transportation of commodities in foreign commerce to *American* ports. Regulation of the dual-rate contract system as it applies to *American* foreign commerce would be practically nonexistent, therefore, if a majority of the carriers—the foreign shipowners—were thus without the scope of the law.

In Compagnie Générale Transatlantique v. American Tobacco Co., 2 Cir., 1929, 31 F.2d 663, cert. den., 280 U.S. 555, 50 S.Ct. 16, 74 L.Ed. 611 (1929), the Second Circuit held that conference shipowners were subject to the provisions of the Shipping Act of 1916 in connection with goods being transported between France and the United States even though the bill of lading was issued in France, the court indicating that Congress clearly meant to regulate all foreign commerce. See also Kerr Steamship Company v. United States, 2 Cir., 1960, 284 F.2d 61, cert. granted, petition for review dismissed as moot, 369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Montship Lines, Limited v. Federal Maritime Board, 1961, 111 U.S.App.D.C. 160, 295 F.2d 147. We believe that Congress intended the provisions of the Act, including Sections 14b and 15, to apply to all common carriers or conferences of such carriers, foreign or American, in foreign commerce with the United States; that these statutory provisions apply as well to foreign carriers and their dual-rate contracts executed in foreign countries with foreign nationals.

Affirmed.

eign and 2 American; North Atlantic United Kingdom Conference, 11 foreign and 1 American. (Senator Kefauver's remarks in the Senate while the amend-ments to the Shipping Act of 1916 (H.R. 6775) were being considered) 107 Cong. Rec. 19343, 19344 (1961).