### CIVIL AERONAUTICS BOARD, Plaintiff,

v.

### BRITISH AIRWAYS BOARD d/b/a British Airways, Defendant.

### No. 77 Civ. 1456–CSH.

United States District Court, S. D. New York.

June 10, 1977.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for plaintiff; Carl T. Solberg, Asst. U. S. Atty., of counsel.

William C. Clarke, New York City, for British Airways Bd.

Cahill, Gordon & Reindel, New York City, for Seaboard World Airlines, Inc., amicus curiae; Irwin Schneiderman, Henry G. Bisgaier, Joel C. Balsam, John A. Shutkin, New York City, Fisher & Gelband, Washington, D. C., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In a case demonstrating that Lord Palmerston's mid-nineteenth century, *simplex munditiis* view of national self-interest[1] has continuing vitality in the jet age, plaintiff Civil Aeronautics Board ("C.A.B." or the "Board") sues to enjoin defendant British Airways Board, doing business as British Airways, from violating the Federal Aviation Act of 1958, as amended, 49 U.S.C. §§ 1301 *et seq.* ("the Act"). The alleged violation lies in British Airways' charging certain rates for the carriage by air of particular commodities from the United Kingdom to the United States, such rates not being included in tariffs on file with the C.A.B. British Airways contends that the Act does not extend to the activities complained of; or, if it purports to do so, principles of international law require denial of an injunction. A preliminary injunction was denied, so that further briefs and the views of the United States Department of State could be received and considered. Both parties now move for summary judgment. Seaboard World Airlines, Inc. ("Seaboard"), *amicus curiae*, has filed a brief supporting the C.A.B. For the reasons stated, summary judgment is granted to the C.A.B., the motion of British Airways is denied, and the injunction will issue.

### I.

#### A. The Pertinent Statute

The C.A.B. is a regulatory agency, created by the Act, 49 U.S.C. § 1321, and "vested

---

1. "But all I say is, that our guiding rule is to promote and advance, as far as we can, the interests of the country to which we have the good fortune to belong, and which we have the honour to serve. We have no everlasting union with this or that country—no identification of policy with another. We have no natural enemies—no perpetual friends. When we find a Power pursuing that course of policy which we wish also to promote, that Power, for the time, becomes our ally; and when we find a country whose interests are at variance with our own, we are involved for a time with the Government of that country. We find no fault with other nations for pursuing their interests; and they ought not to find fault with us if, in pursuing our interests, our course may be different from theirs." Palmerston, Lord, May 16, 1848, Hansard, 3rd Series, Volume 98, pp. 1129–30.

with statutory authority to determine the overall transportation policy which best serves the interest of the public." *Foreign Study League v. Civil Aeronautics Board,* 475 F.2d 865, 870 (10th Cir. 1973). The statutory aims which the C.A.B. is mandated to pursue are broadly stated, 49 U.S.C. § 1302;[2] its regulatory powers are equally broad, 49 U.S.C. § 1324(a).[3]

In essence, the C.A.B. regulates air transportation. "Air transportation" includes "foreign air transportation", 49 U.S.C. § 1301(10), which is in turn defined as the carriage by aircraft of persons or property for compensation between "a place in the United States and any place outside thereof." 49 U.S.C. § 1301(21)(c). "Foreign air

carriers" are subject to regulation under the Act; they are defined as non-United States citizens who engage in foreign air transportation. 49 U.S.C. § 1301(19). The C.A.B. issues certificates of public convenience and necessity to domestic air carriers, without which they cannot engage in air transportation. 49 U.S.C. § 1371. The C.A.B. also issues permits to foreign air carriers, without which they cannot engage in foreign air transportation involving the United States. 49 U.S.C. § 1372.[4] Unlike the certificates issued to domestic air carriers, the C.A.B.'s actions in respect of permits issued to foreign air carriers are subject to the approval of the President of the United States. 49 U.S.C. § 1461.[5]

2. 49 U.S.C. § 1302 provides:

"In the exercise and performance of its powers and duties under this chapter, the [Civil Aeronautics Board] shall consider the following, among, other things, as being in the public interest, and in accordance with the public convenience and necessity:

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the United States Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the United States Postal Service, and of the national defense;

"(e) The promotion of safety in air commerce; and

"(f) The promotion, encouragement, and development of civil aeronautics."

3. 49 U.S.C. § 1324(a) provides:

"The Board is empowered to perform such acts, to conduct such investigations, to issue and amend such orders, and to make and amend such general or special rules, regulations, and procedure, pursuant to and consistent with the provisions of this chapter, as it

shall deem necessary to carry out the provisions of, and to exercise and perform its powers and duties under, this chapter."

4. 49 U.S.C. § 1372(b) provides that the Board (i. e., the C.A.B.) is empowered to issue a permit to a foreign air carrier:

". . . if it finds that such carrier is fit, willing, and able properly to perform such air transportation and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation will be in the public interest."

5. 49 U.S.C. § 1461 provides:

"(a) The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before publication thereof.

"(b) Any order of the Board pursuant to section 1482(j) of this title suspending, rejecting, or canceling a rate, fare, or charge for foreign air transportation, and any order rescinding the effectiveness of any such order, shall be submitted to the President before publication thereof. The President may disapprove any such order when he finds that disapproval is required for reasons of the national defense or the foreign policy of the United States not later than ten days following submission by the Board of any such order to the President."

British Airways is currently operating to and from the United States pursuant to a permit issued under § 1372. The permit recites, *inter alia*:

"BRITISH AIRWAYS BOARD is hereby authorized, subject to . . . the provisions of the Federal Aviation Act of 1958, and the orders, rules and regulations issued thereunder, to engage in foreign air transportation . . . The exercise of the privileges granted hereby shall be subject to such reasonable terms, conditions and limitations required by the public interest as may from time to time be prescribed by the Board."

The C.A.B. has concerned itself with rates charged by air carriers, domestic and foreign, because of its mandate to prevent "unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices", 49 U.S.C. § 1302, quoted at n. 2 *supra*.

Thus the Act requires foreign air carriers such as British Airways to file with the C.A.B. tariffs showing all rates for air transportation between the points served, and to charge, demand, collect or receive only those rates specified in its currently effective tariffs. 49 U.S.C. § 1373(a) and (b).[6] Comparable requirements appear in the regulations. 14 C.F.R. Part 221.

In 1972 Congress amended the Act so as to strengthen the C.A.B.'s ability to regulate international rates. The amendments were prompted by a prior international incident the details of which are not necessary to rehearse; it is sufficient to state for our present purposes that the amendments contained provisions which were frankly recognized as conferring "retaliatory power" upon the C.A.B., in order:

". . . to set the stage properly for consultations and negotiations between the United States and other governments concerned and to protect the position of the U.S. carriers."[7]

The principal 1972 amendments relating to foreign air transportation appear in 49 U.S.C. § 1482(j). New tariffs filed by domestic or foreign air carriers are subject to hearings by the Board, as a result of a complaint or on its own initiative, to determine the "lawfulness" of the rates, and pending the hearing and decision the Board may suspend the operation of the new tariff. § 1482(j)(1). Similar powers of inquiry and suspension in respect of existing tariffs are conferred by § 1482(j)(2). The "retaliatory power" of which Senator Cannon spoke appears in § 1482(j)(3); if the Board finds that a foreign government or its authorities have refused to permit the charging of Board-approved rates "for foreign air transportation to such foreign country", the Board may, without hearing, "suspend the operation of any existing tariff of any foreign air carrier providing services between the United States and such foreign country . . . ."[8] § 1482(j)(4) provides explicitly that certificates held by domestic air carriers, and permits held by foreign air carriers, are conditioned upon "the provisions of this subsection and compliance with any order of the Board issued pursuant thereto . . . ."[9] Finally, § 1482(j)(5) specifies

---

6. 49 U.S.C. § 1373 provides:

"(a) Every . . . foreign air carrier shall file with the Board . . . tariffs showing all rates, fares, and charges for air transportation between points served by it . . . and the Board is empowered to reject any tariff so filed which is not consistent with this section and such regulations. Any tariff so rejected shall be void . . .

"(b)(1) No . . . foreign air carrier . . . shall charge or demand or collect or receive a greater or less or different compensation for air transportation . . . than the rates, fares, and charges specified in then currently effective tariffs of such . . . foreign air carrier . . . ."

7. Cong. Rec.—Senate (February 24, 1972) at S2457; remarks of Senator Howard Cannon, introducing the amendments.

8. Such suspension may not exceed 365 days in the aggregate. § 1482(j)(3). Under a 1972 amendment to § 1461, a suspension order under § 1482(j) affecting a foreign air carrier is subject to the approval of the President. § 1461(b).

9. § 1482(j)(4) provides in full:

"The provisions of this subjection and compliance with any order of the Board issued pursuant thereto shall be an express condition to the certificates or permits now held or hereafter issued to any air carrier or foreign air carrier,

certain factors the Board is to consider in wielding its expanded powers, including economic factors.[10]

The present action for injunctive relief is brought by the C.A.B. against British Airways pursuant to the jurisdictional grant to this Court contained in 49 U.S.C. § 1487.[11]

### B. The Present Case

In the case at bar, the C.A.B. alleges, and British Airways does not deny, that the latter is charging and collecting rates which do not appear in any tariff on file with the Board. The manner in which this state of affairs arose may be briefly stated.

Between 1974 and 1976, westbound air cargo shipments from the United Kingdom to the United States fell off substantially, causing concern to the British government.[12] The consequent loss of revenue was presumably felt by British Airways, the only British carrier engaging in scheduled air cargo service between Britain and the U.S., and the four competing U.S.—flag carriers: Pan American World Airways, Trans World Airways, National Airlines and Seaboard.

British Airways responded to this situation by attempting to file a tariff with the C.A.B., establishing lower, discount rates in certain circumstances. Specifically, on August 13, 1976, British Airways filed a tariff with the C.A.B., designated as International Cargo Contract Rates Tariff No. 1, C.A.B. No. 23, which sought to establish new contract cargo rates for shippers of large annual volumes of cargo from three major cities in Great Britain to various cities in the United States.[13] Contract cargo rates are bulk tender discount rates available for large tenders by shippers and cargo consolidators, which result in a saving to the shipper concomitant with a reduction in administrative and handling costs incurred by the airline.[14]

By Order dated September 3, 1976, the C.A.B. rejected the August 13, 1976 filing citing administrative irregularities and violation of the C.A.B.'s "seven cities" order. The "seven cities" order reflects the posi-

and the maintenance of rates, fares, or charges in conformity with the requirements of such provisions and such order of the Board shall be a condition to the continuation of the affected service by such air carrier or foreign air carrier."

**10.** § 1482(j)(5) includes, as factors for consideration:

". . . (E) the need of such air carrier and foreign air carrier for revenue sufficient to enable such air carrier and foreign air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier and foreign air carrier service; and "(F) whether such rates will be predatory or tend to monopolize competition among air carriers and foreign air carriers in foreign air transportation."

**11.** 49 U.S.C. § 1487(a) provides:

"If any person violates any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term, condition, or limitation of any certificate or permit issued under this chapter, the Board or Administrator, as the case may be, their duly authorized agents, or, in the case of a violation of section 1514 of this title, the Attorney General, or, in the case of a violation of section 1371(a) of this title, any party in interest, may apply to the district court of the United States, for any district wherein such person carries on his business or wherein the violation occurred, for the enforcement of such provision of this chapter, or of such rule, regulation, requirement, order, term, condition, or limitation; and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining such person, his officers, agents, employees, and representatives, from further violation of such provision of this chapter or of such rule, regulation, requirement, order, term, condition, or limitation, and requiring their obedience thereto."

**12.** British Airways' brief in opposition to the preliminary injunction states:

"Westbound air cargo shipments from the United Kingdom to the United States have declined drastically from 55.8 million kilograms in 1974 to only 33.5 million kilograms in 1976, reflecting adverse economic conditions. This decline in British air exports is, of course, a matter of concern to the British Government and to the air carriers operating in the market."

**13.** The points of departure in England were: Glasgow, London and Manchester; the points of destination in the United States were: Boston, Chicago, Detroit, Miami, New York, Philadelphia and Washington D. C.

**14.** See British Airways' Memorandum of Law in Opposition to Motion for Preliminary Injunction, pp. 6 and 7.

tion of the C.A.B. that a system of add-on charges to New York rates is an improper mode of arriving at rates for shipments destined for other United States cities.[15] Instead, the Board preferred a system of mileage related charges, which presumably would have the effect of avoiding discrimination against certain cities vis-a-vis a shipper's desire to choose a city of destination most economical from the point of view of overall transportation costs.

As a result of the September 3, 1976 rejection, British Airways filed another Cargo Contract Rates Tariff (designated as No. 2, C.A.B. No. 24), similar in terms to its August 13, 1976 filing and covering the same points of departure and destination. Again, on the basis of technical infirmities and violation of the seven cities" order, the C.A.B. rejected the filing.

Diplomatic negotiations between the British government and the United States followed from the C.A.B.'s rejection of the proposed tariffs. Notwithstanding such endeavors, British Airways adjusted its contract rates to conform to the "seven cities" order, and proffered still another tariff to the C.A.B. on December 3, 1976.

Although not rejected on technical grounds, the C.A.B. suspended enforcement of this tariff for up to one year pending investigation, which action was submitted to President of the United States for his review pursuant to 49 U.S.C. § 1461. This suspension became effective on December 31, 1976.

The C.A.B.'s suspension order stated:

"Upon consideration of the tariff filing, the complaints and all other relevant matters, the Board has concluded that the proposed rates may be unjust, unreasonable, unjustly discriminatory, unduly preferential, unduly prejudicial, or otherwise unlawful, and should be investigated. The Board further concludes that the rates should be suspended pending investigation."

The C.A.B. had, apparently, received data from British Airways' U.S.-flag competitors that British Airways' proposed discount contract rates were uneconomical.

British Airways returned to the bureaucratic fray with a special tariff permission application dated January 5, 1977, containing the same rates, and asking permission to file on one day's notice. That special application was premised upon an order issued by Civil Aviation Authority ("C.A.A."), the United Kingdom equivalent of the C.A.B. The C.A.A.'s order directs British Airways to charge and collect the very discount contract rates which were the subject of the C.A.B.'s suspension order. The C.A.A. order, which takes the form of a letter to British Airways dated December 22, 1976, prefaces its directive with this paragraph:

"On 10th December, 1976 during formal discussions between the Governments of the U.K. and the U.S.A. under the terms of the Bermuda Agreement, the U.K. representatives expressed concern at the prolonged delays by the U.S. authorities in their handling of British Airways filings for the above rates which had been approved by the U.K. over four months previously. Since there was no apparent change in the American attitude the U.K. stated formally that British Airways would be authorised to implement the rates filed. This statement was confirmed by Mr. G. T. Rogers, of the Department of Trade, in his letter dated 16th December, 1976 to Mr. W. P. Clappin, Civil Air Attache at the U.S. Embassy in London."

Consequently with submission of this new tariff, British Airways applied to cancel the suspended tariff of December 3.

Not visibly impressed by this buttressed application, the C.A.B. rejected the latest tariff for filing, on the grounds that it unlawfully proposed to "change the matter under suspension" in the prior proceeding, and violated the seven cities order. Special

---

15. See Affidavit of James W. Greene, Chief, Tariffs Section, Civil Aeronautics Board, and Appendix D thereto.

permission for one-day filing was denied because "similar tariffs were suspended previously." [16] The application to cancel the suspended tariff was granted.

On January 25 and February 9, 1977, agents of the C.A.B.'s Bureau of Enforcement examined certain freight records of British Airways at Kennedy International Airport in New York. On the February 9, 1977 visit, the agents found air waybills indicating that British Airways was charging rates which were not on file with nor approved by the C.A.B.

British Airways does not dispute the agents' findings, but rather admits that it was charging those rates which were contained in the various tariffs either rejected or suspended by the C.A.B. during the period September, 1976 to January, 1977. British Airways avers that it was charging such rates as the consequence of the order issued by the British C.A.A.

In essence, British Airways urges that it had been afforded a "Hobson's choice" of either violating the directive of the British C.A.A. or charging rates not approved or sanctioned by the C.A.B. under the relevant provisions of the Federal Aviation Act, *supra.* As the result of British Airways choosing the latter alternative, the C.A.B. commenced the instant action, invoking the provisions of 49 U.S.C. § 1487, to enjoin further violations of the Act.

## II.

The C.A.B. portrays this case as a simple one. British Airways is currently charging rates which do not appear in an approved tariff on file; the Act prohibits such charges; consequently an injunction under 49 U.S.C. § 1487 must issue.

In its defense, British Airways relies upon limitations circumscribing the powers of Congress and this Court: limitations which are said to derive from established principles of international law.

While the concepts and issues are debated at length in the briefs, British Airways places primary reliance upon the directive given to it by the British C.A.A.: namely, to charge and collect those contract rates which the United States C.A.B. has declined to accept. This governmental directive runs like a *leitmotif* throughout British Airways' arguments. Thus it is said that the Federal Aviation Act should not be construed to apply extraterritorially to the charging of rates "in Britain by British Airways at the direction of the British Government . . ." [17] Alternatively, assuming a statutory construction of extraterritorial application, it is said that international law precludes this Court "from enjoining conduct of foreign nationals in a foreign country which is required by the foreign sovereign." [18]

■ It is apparent that the December 22, 1976 directive of the British C.A.A. furnishes the one element of novelty in this case. That is to say, the authority of the C.A.B. to issue directives in respect of conduct of foreign nations in a foreign country, where such conduct impinges upon commerce to or from the United States, is well recognized. *Deutsche Lufthansa A.G. v. C.A.B.,* 156 U.S. App.D.C. 191, 479 F.2d 912 (D.C.Cir. 1973) (C.A.B. regulation requiring printing on tickets of notice of the Warsaw Convention limitations of liability, held applicable and enforceable in respect of tickets issued abroad by German airline for transportation to the United States). Judge Sobeloff's opinion observes:

"Congress may regulate conduct of noncitizens, even if that conduct takes place in a foreign country, if the consequences of the conduct are felt within the United States, *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir. 1945); *United States v. Pacific Arctic Co.,* 228 U.S. 87, 105–106, 33 S.Ct. 443, 57 L.Ed. 742 (1913); cf. *Timkin Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct.

---

**16.** Greene Affidavit, *supra,* and Appendix D.

**17.** British Airways' brief in opposition to preliminary injunction, p. 23.

**18.** *Ibid.,* p. 32.

971, 95 L.Ed. 1199 (1951) (antitrust cases)." 479 F.2d at 917 n. 9.

■ Comparable authority exists in that other great medium of international commerce, the oceans. In *Armement Deppe S. A. v. United States,* 399 F.2d 794 (5th Cir. 1968), cert. den., 393 U.S. 1094, 89 S.Ct. 870, 21 L.Ed.2d 785, the United States sought penalties from nine foreign common carrier steamship lines engaged in ocean carriage from European to U.S. Gulf ports. The Government alleged that the defendants had violated Sections 14b and 15 of the Shipping Act of 1916 as amended, 46 U.S.C. §§ 813a, 814, which permitted the use of dual-rate contracts under certain conditions, and forbade them in others.[19] The foreign-flag shipowners, seeking to limit the effective reach of the statute, characterized the contracts in question as involving nothing more than the tender of the shippers' cargoes, in European ports, for carriage by foreign vessels. Defendants' principal argument proceeded from that characterization:

"They attempt thereby to impress us that so far as the dual-rate contracts are concerned, they were completed in a foreign country when tender of shipments was made by foreign shippers to foreign carriers. Appellants contend, therefore, that all of the dual-rate contracts here involved are by foreign shipowners with foreign shippers and that the Shipping Act of 1916 as amended, cannot have extraterritorial effect in relation to these foreign nationals." 399 F.2d at 797–798.

Rejecting that argument, the Fifth Circuit observed:

"But they thus ignore the provisions of their own dual-rate contracts and the plain language of Section 14b. The sample contract in the record discloses that the merchant who contracts with the carriers agrees to transport all of his commodities to United States Gulf ports from

Europe, using Conference carriers, and that the failure to do so is a violation of the contract. By the terms of the contract (para. 1) 'the Merchant agrees to offer, or cause to be offered to the Carriers *for transportation by them to the United States* through any port * * * in the Gulf of Mexico * * * all shipments of the commodities mentioned. * * * ' (Emphasis added.)" 399 F.2d at 798.

On these facts, which (save for the British C.A.A. directive) mirror those of the case at bar, the court perceived in the Commerce Clause of the Constitution, Art. I, § 8, ample authority for extraterritorial application of the Shipping Act's requirements:

"We have no difficulty, therefore, holding that under the power which Congress has to regulate commerce with foreign nations under Art. I, § 8 of the Constitution, it has authority to enact laws regulating the shipping contracts of foreign-owned shipping lines regardless of the fact that the contracts are executed in foreign countries with foreign nationals, inasmuch as the contracts are to be used, employed, and carried out in American foreign commerce in the delivery of goods to American ports. Consummation of the contracts is, therefore, by acts which are ultimately performed in the United States—thus making them subject to the laws of this nation. The only logical conclusion fairly to be reached is that foreign-owned ships which use our American ports must comply with the laws of the United States in connection with shipping contracts and specifically with the employing of the dual-rate contract system." 399 F.2d at 798–799.

The Fifth Circuit's conclusion draws heavily upon decisions of the Second Circuit:

"In *Compagnie Générale Transatlantique v. American Tobacco Co.,* 2 Cir., 1929, 31 F.2d 663, cert. den., 280 U.S. 555, 50 S.Ct.

19. As explained in *Armement,* "A dual-rate contract system is one under which shippers, by agreement, tender all or any fixed portion of their cargo destined for certain designated American ports to conference carriers, as a result of which they pay a lower rate for the shipping of commodities than other shippers." 399 F.2d at 796. The resemblance to British Airways' contract rates in the case at bar is striking.

16, 74 L.Ed. 611 (1929), the Second Circuit held that conference shipowners were subject to the provisions of the Shipping Act of 1916 in connection with goods being transported between France and the United States even though the bill of landing was issued in France, the court indicating that Congress clearly meant to regulate all foreign commerce. See also *Kerr Steamship Company v. United States*, 2 Cir., 1960, 284 F.2d 61, cert. granted, petition for review dismissed as moot, 369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); *Montship Lines, Limited v. Federal Maritime Board*, 1961, 111 U.S.App.D.C. 160, 295 F.2d 147. We believe that Congress intended the provisions of the Act, including Sections 14b and 15, to apply to all common carriers or conferences of such carriers, foreign or American, in foreign commerce with the United States; that these statutory provisions apply as well to foreign carriers and their dual-rate contracts executed in foreign countries with foreign nationals." 399 F.2d at 800.

In an appropriate case, an injunction will issue under the Shipping Act, even though its effect is to restrain the collection of charges by foreign shipowners in foreign countries. *Federal Maritime Commission v. Australia/U. S. Atlantic and Gulf Conference*, 337 F.Supp. 1032 (S.D.N.Y.1972) (injunction issued, per Weinfeld, D. J., to restrain conference of ocean carriers engaged in transportation of goods from Australia to U.S. Atlantic and Gulf ports from putting into effect an increased tariff intended to impose a "currency devaluation adjustment surcharge").

These authorities, in the absence of the British C.A.A. directive, would clearly entitle the C.A.B. to the relief sought. *Deutsche Lufthansa* is squarely in point on the extraterritoriality issue. Despite British Airways' arguments to the contrary, I perceive no meaningful difference between the statutory and regulatory schemes affecting transportation by sea and by air;

both are grounded in the Commerce Clause of the Constitution, and are designed to control activities affecting commerce with the United States; and in consequence *Armement* and other cases arising under the Shipping Act furnish useful precedent in delineating the legitimate boundaries of the Federal Aviation Act, and the power of this Court to enforce the Act's requirements.

We come, then, to the effect of the British C.A.A. directive. The precise question is whether that directive has the effect of depriving the C.A.B. of the remedy, and this Court of the power to enforce the remedy, that would otherwise obtain. That question I answer in the negative.

In evaluating the effect of the British C.A.A. directive, it is appropriate to consider first a factor which both the C.A.B. and Seaboard stress, and to which British Airways does not respond. The argument is made that, unlike U.S.-flag carriers, which are unsubsidized, privately-owned corporations depending for their existence upon success in a competitive market, British Airways "is the wholly government owned and operated airline of the United Kingdom."[20] At the oral argument the Assistant United States Attorney stated:

"It should be borne in mind at this point that there is a certain unity of interest between the United Kingdom government and British Airways which is an instrument of the government. This is not simply a situation of a private independent carrier being ordered to do something by its government." Tr. 8.

Considering the vigor with which the parties in this case challenge each other's assertions, it is fair to conclude from the silence of British Airways on the point in question that British Airways is, in fact, a creature of the British government. In these circumstances, the C.A.A. directive may be regarded as a communication from the British government to itself. The effect, vaguely schizophrenic, is that of looking at oneself in the mirror and sternly telling

---

**20.** Seaboard *amicus* brief at p. 3.

oneself what to do. I regard this as a factor of significance, for reasons which will be set forth below.

The question is a narrow one: whether, in the circumstances of the case, this Court should enjoin a conceded and continuing violation of the Act. The issue of the propriety of the C.A.B.'s actions is not cognizable by the Court. In *C. A. B. v. Donaldson Air Line (Air Services) Limited,* 343 F.Supp. 1059 (S.D.N.Y.1972), this Court in an opinion by Judge Pollack enjoined a British operator of charter flights to the United States from disregarding the Board's requirement of advance approval of each flight. Judge Pollack observed:

"A consideration of the validity of defendant's permit or the conditions therein, including the prior approval condition invoked, would be to engage the Court in a matter exclusively within the prerogative of the President and not subject to judicial review. *Pan American World Airways, Inc. v. C. A. B.,* 129 U.S.App. D.C. 159, 392 F.2d 483 (1968); cf. *British Overseas Airways Corp. v. C. A. B.,* 113 U.S.App.D.C. 76, 304 F.2d 952 (1962). "There is a distinction in the law applicable as between citizen-carriers and foreign air carriers. This, according to the authority cited below, represents deference to the 'plain language of the statute itself', and a recognition that the issuance and supervision of foreign air carrier permits involve quite different considerations than do the issuance of certificates of public convenience and necessity to citizen air carriers. *Pan American World Airways, Inc. v. C. A. B.,* 129 U.S.App. D.C. 159, 392 F.2d 483, 490, 493 (1968)." 343 F.Supp. at 1062.

In the case at bar, the C.A.B. is entitled to comparable injunctive relief, in accordance with "the plain language of the statute itself", unless the British C.A.A. directive operates as a bar. I hold it does not.

The researches of counsel and the Court have failed to disclose a case squarely in point on the effect of a foreign government directive. The only case where the subject of such a directive was touched upon is *C. A. B. v. Alitalia-Linee Aeree Italiane, S.p.A.,* 328 F.Supp. 759 (E.D.N.Y.1971), an opinion of the late Judge Judd. In that case, the court issued a preliminary injunction restraining Alitalia, 80% of whose stock was owned by the Italian government, from advertising and selling round-trip tickets between U.S. east coast ports and Rome and Milan at discount rates not included in the Alitalia tariffs on file with the C.A.B. Defending the suit, Alitalia relied upon an order from the Ministry of Transportation and Civil Aviation of Italy, instructing Alitalia to charge the rates in question. Rejecting that defense, Judge Judd expressed initial uncertainty as to whether the Transportation Ministry's order called for putting the rates into effect without C.A.B. approval. Assuming, however, that the directive should be so read, Judge Judd went on to observe:

"Even if the intention were that the rates apply immediately, no case has been cited which permits a foreign government to direct its nationals in the United States to defy American law. *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), cited by defendant, related to activities in Costa Rica and refused to apply the Sherman Act there. It is quite another thing to claim exemption from American law in New York. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 [319] (1952) related to use of a United States trademark in Mexico, where it was registered in the adversary's name. Defendant's other cases are similarly distinguishable." 328 F.Supp. at 761.

Both parties in the case at bar profess to find comfort in these words. The C.A.B. points out that the injunction issued, notwithstanding the Italian government directive. British Airways finds, in the above-quoted language, the negative implication that had the activities in question been taking place in Italy, the Italian government directive would have sustained the defense.

For my part, I do not perceive any compelling guideline in either the holding or the rationale of the *Alitalia* case. My resolution of the decisive issue depends, rather, upon a consideration of the Act's underlying purposes, and the manner in which those purposes are sought to be avoided by British Airways in the case at bar.

If a foreign government is able, by the device of issuing a directive to its wholly-owned airline, to nullify the requirements of the Federal Aviation Act and the regulations issued thereunder, then that statute, and comparable statutes by which Congress seeks to regulate commerce with the United States, become ineffectual and meaningless documents. Such a holding, which is in essence what British Airways urges in the case at bar, would have far-reaching results. If the British government, by such a directive, may avoid the tariff and rate requirements of the Act in the case at bar, what is there to prevent any other government, seeking to avoid any regulation or requirement which it does not favor, from issuing a comparable directive to a state-owned airline or shipping company, thereby nullifying the acts of Congress in respect of air transportation or ocean carriage? It is not reasonable to assume that Congress itself anticipated or approved such a state of affairs when it enacted the statutes in question; nor may this result be imposed by principles of international law.

In *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), the Second Circuit, in an opinion by Judge Learned Hand, extended the Sherman Act to restrictive business practices by non-American firms abroad, in circumstances where those practices were "intended to affect and did affect" the foreign commerce of the United States. The general principles declared by Judge Hand, in respect of the regulation of conduct abroad, apply with equal force to the case at bar:

". . . [W]e are concerned only with whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it. That being so, the only question open is whether Congress intended to impose the liability, and whether our own Constitution permitted it to do so: as a court of the United States, we cannot look beyond our own law. Nevertheless, it is quite true that we are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the 'Conflict of Laws.'" 148 F.2d at 443.

In the case at bar, the question is whether the British C.A.A. directive gives rise to one of those "limitations customarily observed by nations upon the exercise of their powers." I conclude that a directive, given by a foreign government to its wholly-owned airline, mandating disobedience by the airline of American regulations which the airline's permit obligated it to obey, does not rise to the level of imposing limitations upon the powers, otherwise clearly applicable, of the United States and its designated agency, the C.A.B.

The Court holds, in sum, that the British C.A.A. directive does not and cannot relieve British Airways from the generally recognized rule that one wishing to take advantage of the facilities of United States commerce "must be willing to comply fully with United States law." *Fontaine v. Securities & Exchange Commission*, 259 F.Supp. 880, 891 (D.P.R.1966). In the case at bar, the requirements of the Act are entirely clear, and there is at present non-compliance by British Airways. British Airways has three options: compliance with the laws of this country; foregoing the pursuit of commerce with the United States, cf. *First National City Bank v. Internal Revenue Service*, 271 F.2d 616, 620 (2d Cir. 1959), *cert. den.*, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381; or renewed diplomatic efforts to achieve a mutually satisfactory agreement, cf. *Kerr Steamship Co. v. United States*, 284 F.2d 61, 64 (2d Cir. 1960) (opinion by Judge Learned Hand upholding authority of Federal Maritime Board to order ocean carriers to file lists identifying contracts affecting United States commerce, even if made out-

side the United States; ". . . if such an inquiry annoys other governments, as apparently it does, their complaint must be addressed to the Executive; it is not a matter with which the courts have any power to deal.")

British Airways argues that the Act should be read in such a manner as to recognize the overriding effect of the British C.A.A. directive. These arguments are unpersuasive. First, reliance is had upon 49 U.S.C. § 1502, which provides in pertinent part:

"In exercising and performing their powers and duties under this chapter, the Board and the Secretary of Transportation shall do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country or foreign countries, and shall take into consideration any applicable laws and requirements of foreign countries and the Board shall not, in exercising and performing its powers and duties with respect to certificates of convenience and necessity, restrict compliance by any air carrier with any obligation, duty, or liability imposed by any foreign country: . . ."

While this section of the statute requires the C.A.B. to "take into consideration any applicable laws and requirements of foreign countries", the amount or degree of such consideration is not specified. I decline to hold that the C.A.B. is required by this provision to give such consideration to the directives of a foreign government that the requirements of the Federal Aviation Act are nullified. Significantly, the mandate to the Board contained in § 1502 that it shall

not "restrict compliance by any air carrier with any obligation, duty, or liability imposed by any foreign country", is limited to the exercise and performance of the Board's powers and duties "with respect to certificates of convenience and necessity . . .", or, in other words, to the regulation of *domestic* air carriers. No such limitation arises in respect of foreign air carriers, who receive substantially different treatment under the Act. See *C. A. B. v. Donaldson Line (Air Services) Ltd., supra.*

British Airways also professes to find, in the "retaliatory power" provisions of 49 U.S.C. § 1482(j)(3), a recognition and acquiescence by Congress that foreign governments, by passing their own directives, may exempt foreign air carriers from the requirements of the Act. But the legislative history of the 1972 amendments makes it quite clear that Congress was motivated by an intent to reinforce, not diminish, the powers of the C.A.B. in dealing with foreign governments and foreign airlines. A construction of § 1482(j)(3) which has the effect of disemboweling the C.A.B.'s own rate structures in respect of foreign airlines is not reasonable.

I have considered the other arguments put forward by British Airways and, essentially for the reasons given *supra,* reject them.

### III.

British Airways urges this Court to stay its injunctive hand, in order to avoid the risk of provoking a legal economic retaliation which would adversely affect American commerce.[21] One may detect, in that argument, a working of the advocate's ancient strategy: *ex hypothesi horribili ad judicem*

---

21. In its brief in support of its motion for summary judgment (pp. 9–10), British Airways states:

"But to construe [the suspension power] as authorizing the Board to prevent the charging of rates in a foreign country by a foreign carrier of that country at the direction of the government of that country would place it into direct conflict with the policy of 49 U.S.C. § 1482(j)(3). Such a construction would inevi-

tably undermine foreign acceptance of the rights asserted for the U.S. in that provision. It would also defeat the very purpose for which such powers would be invoked—protection of U.S. carriers—by exposing U.S. carriers to retaliations against their foreign traffic rights that the U.S. would have no rational basis, under the principles of its own legislation, for opposing." (material in brackets supplied).

*terrendum.*[22] But judges must resist the temptation to depart from their proper function. They are not legislators, diplomats, or members of the executive arm of government. If war may be defined as the failure of diplomacy, then the clash of conflicting directives from national agencies deserves a similar opprobrium. One may deplore the situation—particularly where the parties concerned are those English-speaking nations whose special relationship has been justly celebrated—but perhaps one must conclude, reluctantly, that Palmerston was right. There is nothing novel in the present conflict. The recent, unhappy spectacle of British and Icelandic frigates colliding with each other, in a commercially inspired confrontation between two traditionally friendly powers, comes to mind. In any event, national courts cannot resolve these confrontations. Those courts are necessarily limited to the enforcement of national law, at least to the degree that such enforcement does not do violence to generally accepted principles of international law, a conclusion which for the reasons given *supra* I do not reach in the case at bar. Judges must leave to the heads of state, the diplomats, and the legislatures the resolution of conflicting interests that are, *au fond,* more commercial than legal. *C.A.B. v. Donaldson Air Line (Air Services) Ltd., supra,* at p. 1388. The alternative is an international court of commerce, whose process is mandatory and whose decrees are binding. The realization of that dream has so far eluded mankind; indeed, it has proved elusive in the very area with which we are now concerned, the regulation of international air traffic rates.[23] Until that alternative is realized, American agencies and interests are entitled, in federal courts, to the enforcement of remedies which Congress has provided, consistent with the Constitution and principles of international law.

### IV.

The motion of the C.A.B. for summary judgment is granted. The motion of British Airways for summary judgment is denied. An injunction will issue, restraining British Airways from further violations of the Act.

Settle judgment and order on one day's notice.

22. "Terrify the judge by the hypothesis of horrible consequences."

23. Until very recently, civil air transportation rights between the United Kingdom and the United States, including the setting of rates, were governed by the Air Services Agreement and Final Act of the Bermuda Civil Aviation Conference, done at Bermuda February 11, 1946, 60 Stat. 1499, T.I.A.S. 1507, as amended T.I.A.S. 1609 (1966), popularly known as the "Bermuda Agreement". While Annex II to the Agreement, the "Rate Annex", para. (g), provided for arbitration before the International Civil Aviation Organization of disputes on rates, in practice that remedy has proved unworkable. (See discussion in British Airways' brief in support of motion for summary judgment at p. 18). Indeed, the British Government concluded that the provisions of the Bermuda Agreement in respect of establishment of airline tariffs generally had proved unworkable; and so, in a diplomatic note on June 22, 1976, that government gave notice of termination of the Agreement, effective one year hence. The parties to the present case agree that the Bermuda Agreement provisions are not controlling. Diplomatic negotiations looking towards a renewed agreement are in progress. It is to be hoped that they will succeed, thereby doing away with litigation of this nature. The British Government and the United States Department of State addressed notes to this Court on the issues involved in the case at bar, each note championing in diplomatic terms the positions put forward by counsel in legal terms. Thus the notes, while considered and appreciated by the Court, do no more than demonstrate that diplomacy has not yet succeeded in reconciling the respective national views. Until such reconciliation is achieved, courts of the United States "cannot look beyond our own law." *United States v. Aluminum Co. of America, supra* at p. 1389.